1  MARIA C. ROBERTS, State Bar No. 137907
   mroberts@sheastokes.com
2  RONALD R. GIUSSO, State Bar No. 184483
   rgiusso@sheastokes.com
3  SHEA STOKES ROBERTS & WAGNER, ALC
   510 MARKET STREET, THIRD FLOOR
4  SAN DIEGO, CALIFORNIA 92101-7025
   TELEPHONE:    (619) 232-4261
5  FACSIMILE:    (619) 232-4840

6  Attorneys for *Specially Appearing* Defendant HARRAH'S RINCON RESORT & CASINO

7

8                  UNITED STATES DISTRICT COURT

9                SOUTHERN DISTRICT OF CALIFORNIA

10

11 WILLIAM RANDOL,                          CASE NO. 08-CV-0642 W BLM

12           Plaintiff,                     Action Date:   January 18, 2008
                                            Judge:         Hon. Thomas J. Whelan
13 vs.                                      Mag. Judge:    Hon. Barbara L. Major

14 HARRAH'S RINCON RESORT & CASINO          NOTICE OF LODGMENT OF EXHIBITS IN
   and DOES 1-10,                           SUPPORT OF MOTION TO DISMISS BY
15                                          *SPECIALLY APPEARING* DEFENDANT
             Defendants.                    HARRAH'S RINCON RESORT & CASINO
16                                          PURSUANT TO F.R.Civ.P.12(b)(1),(2),(6),(7)

17                                          ACCOMPANYING PLEADINGS:
                                            NOTICE OF MOTION AND MOTION;
18                                          MEMORANDUM OF POINTS AND
                                            AUTHORITIES; DECLARATIONS OF
19                                          RONALD R. GIUSSO AND MICHAEL E.
                                            KOSTRINSKY; [PROPOSED ORDER
20
                                            **NO ORAL ARGUMENT PURSUANT TO
21                                          LOCAL RULE**

22                                          Date:      May 19, 2008
                                            Time:      9:30 a.m.
23                                          Courtroom: 7

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

   4816-4231-5266.1                        CASE NO. 08-CV-0642 W BLM

1       Defendant HARRAH'S RINCON RESORT & CASINO lodges the following evidence in

2 support of its motion to dismiss:

3

4       Exhibit 1:    A true and correct copy of the Complaint filed by William Randol on

5 January 18, 2008.

6

7       Exhibit 2:    A true and correct copy the Tribal-State Compact Between The State of

8 California and The Rincon, San Luiseno Band of Mission Indians.

9

10       Exhibit 3:    A true and correct copy of the Patron Tort Claims Ordinance which has

11 been enacted by the Rincon San Luiseno Band of Mission Indians.

12

13                   SHEA STOKES ROBERTS & WAGNER, ALC

14

15 Dated: April 16, 2008         By:  s/Maria C. Roberts

16                       Maria C. Roberts
                      Ronald R. Giusso

17                       Attorneys for *Specially Appearing* Defendant
                      HARRAH'S RINCON RESORT & CASINO

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 1

03/10/2008 15:05 FAX 702 407 6286        HARRAH'S LAW DEPARTMENT                    ☒002/012

FILED
NORTH COUNTY DIVISION

**SUM-100**

## SUMMONS
### (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

08 JAN 18 AM 11:18

(20)
CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Harrah's Rincon Resort and Casino, and does 1-10

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
William Randol

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff.   A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case.  There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you.  If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| The name and address of the court is: *(El nombre y dirección de la corte es):* 325 South Melrose, Vista, Ca., 92056   SAN DIEGO SUPERIOR COURT | CASE NUMBER: *(Número del Caso):* SIV-2008-00050413-CU-PO-NC |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Earl F. Tritt, III, # 141754, 222 Ash Street, San Diego, Ca., 92101, (619) 239-9695

| DATE: *(Fecha)* JAN 1 8 2008 | Clerk, by *(Secretario)* M. Bates | , Deputy *(Adjunto)* |
|---|---|---|

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010).*

[SEAL]

**NOTICE TO THE PERSON SERVED: You are served**
1. ☐ as an individual defendant.
2. ☑ as the person sued under the fictitious name of *(specify):*
      Harrah's Rincon Resort and Casino

3. ☑ on behalf of *(specify):*

   under: ☑ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☑ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):* Unknown
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465

American LegalNet, Inc. [www.USCourtForms.com]

FILED
NORTH COUNTY DIVISION

PLD-PI-001

08 JAN 18 AM 9:13

(20)
CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | *FOR COURT USE ONLY* |
|---|---|

Earl F. Tritt, III        #141754
222 Ash Street
San Diego, Ca. 92101

TELEPHONE NO.: 619-239-9695        FAX NO. *(Optional):*

E-MAIL ADDRESS *(Optional):*

ATTORNEY FOR *(Name):* William Randol

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
STREET ADDRESS: 325 South Melrose
MAILING ADDRESS:
CITY AND ZIP CODE: Vista, Ca. 92056
BRANCH NAME: Northern

PLAINTIFF: William Randol

DEFENDANT: Harrah's Rincon Resort and Casino

[✓] DOES 1 TO  10

**COMPLAINT—Personal Injury, Property Damage, Wrongful Death**
[ ] AMENDED *(Number):*

Type *(check all that apply):*
[ ] MOTOR VEHICLE        [ ] OTHER *(specify):*
    [ ] Property Damage      [ ] Wrongful Death
    [✓] Personal Injury      [ ] Other Damages *(specify):*

Jurisdiction *(check all that apply):*
[ ] ACTION IS A LIMITED CIVIL CASE
    Amount demanded    [ ] does not exceed $10,000
                       [ ] exceeds $10,000, but does not exceed $25,000
[✓] ACTION IS AN UNLIMITED CIVIL CASE (exceeds $25,000)
[ ] ACTION IS RECLASSIFIED by this amended complaint
    [ ] from limited to unlimited
    [ ] from unlimited to limited

CASE NUMBER:

37-2008-00050413-CU-PO-NC

1. Plaintiff *(name or names):* William Randol
   alleges causes of action against defendant *(name or names):*
   Harrah's Rincon Resort and Casino

2. This pleading, including attachments and exhibits, consists of the following number of pages:

3. Each plaintiff named above is a competent adult
   a. [ ] except plaintiff *(name):*
      (1) [ ] a corporation qualified to do business in California
      (2) [ ] an unincorporated entity *(describe):*
      (3) [ ] a public entity *(describe):*
      (4) [ ] a minor [ ] an adult
          (a) [ ] for whom a guardian or conservator of the estate or a guardian ad litem has been appointed
          (b) [ ] other *(specify):*
      (5) [ ] other *(specify):*

   b. [ ] except plaintiff *(name):*
      (1) [ ] a corporation qualified to do business in California
      (2) [ ] an unincorporated entity *(describe):*
      (3) [ ] a public entity *(describe):*
      (4) [ ] a minor [ ] an adult
          (a) [ ] for whom a guardian or conservator of the estate or a guardian ad litem has been appointed
          (b) [ ] other *(specify):*
      (5) [ ] other *(specify):*

[ ] Information about additional plaintiffs who are not competent adults is shown in Attachment 3.

Page 1 of 3

Form Approved for Optional Use
Judicial Council of California
PLD-PI-001 [Rev. January 1, 2007]

**COMPLAINT—Personal Injury, Property
Damage, Wrongful Death**

Code of Civil Procedure, § 425.12
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

PLD-PI-001

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Randel v. Harrah's | |

4. ☐ Plaintiff *(name):*

  ⠀⠀is doing business under the fictitious name *(specify):*

  ⠀⠀and has complied with the fictitious business name laws.

5. Each defendant named above is a natural person

**a.** ☑ except defendant *(name):* Harrah's Rincon
  (1) ☑ a business organization, form unknown
  (2) ☐ a corporation
  (3) ☐ an unincorporated entity *(describe):*

  (4) ☐ a public entity *(describe):*

  (5) ☐ other *(specify):*

**c.** ☐ except defendant *(name):*
  (1) ☐ a business organization, form unknown
  (2) ☐ a corporation
  (3) ☐ an unincorporated entity *(describe):*

  (4) ☐ a public entity *(describe):*

  (5) ☐ other *(specify):*

**b.** ☐ except defendant *(name):*
  (1) ☐ a business organization, form unknown
  (2) ☐ a corporation
  (3) ☐ an unincorporated entity *(describe):*

  (4) ☐ a public entity *(describe):*

  (5) ☐ other *(specify):*

**d.** ☐ except defendant *(name):*
  (1) ☐ a business organization, form unknown
  (2) ☐ a corporation
  (3) ☐ an unincorporated entity *(describe):*

  (4) ☐ a public entity *(describe):*

  (5) ☐ other *(specify):*

  ☐ Information about additional defendants who are not natural persons is contained in Attachment 5.

6. The true names of defendants sued as Does are unknown to plaintiff.
  a. ☐ Doe defendants *(specify Doe numbers):* _____ were the agents or employees of other named defendants and acted within the scope of that agency or employment.
  b. ☐ Doe defendants *(specify Doe numbers):* _____ are persons whose capacities are unknown to plaintiff.

7. ☐ Defendants who are joined under Code of Civil Procedure section 382 are *(names):*

8. This court is the proper court because
  a. ☑ at least one defendant now resides in its jurisdictional area.
  b. ☑ the principal place of business of a defendant corporation or unincorporated association is in its jurisdictional area.
  c. ☑ injury to person or damage to personal property occurred in its jurisdictional area.
  d. ☐ other *(specify):*

9. ☑ Plaintiff is required to comply with a claims statute, and
  a. ☑ has complied with applicable claims statutes, or
  b. ☐ is excused from complying because *(specify):*

PLD-PI-001

| SHORT TITLE: | CASE NUMBER |
|---|---|
| Randol v. Harrah's | |

10. The following causes of action are attached and the statements above apply to each (each complaint must have one or more causes of action attached):
   a. [ ] Motor Vehicle
   b. [✓] General Negligence
   c. [ ] Intentional Tort
   d. [ ] Products Liability
   e. [✓] Premises Liability
   f. [ ] Other (specify):

11. Plaintiff has suffered
   a. [✓] wage loss
   b. [ ] loss of use of property
   c. [✓] hospital and medical expenses
   d. [✓] general damage
   e. [ ] property damage
   f. [✓] loss of earning capacity
   g. [ ] other damage (specify):

12. [ ] The damages claimed for wrongful death and the relationships of plaintiff to the deceased are
   a. [ ] listed in Attachment 12.
   b. [ ] as follows:

13. The relief sought in this complaint is within the jurisdiction of this court.

14. Plaintiff prays for judgment for costs of suit; for such relief as is fair, just, and equitable; and for
   a. (1) [✓] compensatory damages
      (2) [ ] punitive damages
      The amount of damages is (in cases for personal injury or wrongful death, you must check (1)):
      (1) [✓] according to proof
      (2) [ ] in the amount of: $

15. [ ] The paragraphs of this complaint alleged on information and belief are as follows (specify paragraph numbers):

Date: January 10, 2008

Earl F. Tritt, III
_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PLAINTIFF OR ATTORNEY)

PLD-PI-001 [Rev. January 1, 2007]

**COMPLAINT—Personal Injury, Property Damage, Wrongful Death**

Page 3 of 3

PLD-PI-001(2)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Randol v. Harrah's | |

**CAUSE OF ACTION—General Negligence**     Page _____

First
_____
(number)

**ATTACHMENT TO** [✓] Complaint  [ ] Cross - Complaint

*(Use a seperate cause of action form for each cause of action.)*

GN-1. Plaintiff *(name):*  **William Randol**

alleges that defendant *(name):*  **Harrah's Rincon Resort and Casino**

[✓] Does 1 _____ to 10 _____

was the legal (proximate) cause of damages to plaintiff. By the following acts or omissions to act, defendant negligently caused the damage to plaintiff
on *(date):* 01/30/2006
at *(place):* Harrah's Rincon Resort and Casino

*(description of reasons for liability):*

Defendant failed to keep it's place of business in a safe manner, which caused the plaintiff to be injured.

Form Approved for Optional Use
Judicial Council of California
PLD-PI-001(2) (Rev. January 1, 2007)

**CAUSE OF ACTION—General Negligence**

Code of Civil Procedure 425.12
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

PLD-PI-001(4)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Randol v. Harrah's | |

<u>Second</u> _____    **CAUSE OF ACTION—Premises Liability**    Page _____
     **(number)**

**ATTACHMENT TO** ☒ Complaint ☐ Cross-Complaint
*(Use a separate cause of action form for each cause of action.)*

Prem.L-1. Plaintiff *(name):* William Randol

    alleges the acts of defendants were the legal (proximate) cause of damages to plaintiff.

    On *(date):* 01/30/2006     plaintiff was injured on the following premises in the following

    fashion *(description of premises and circumstances of injury):*

    **Plaintiff slipped and injured himself, because of defendants failure to adequately warn of dangerous condition.**

Prem.L-2. ☒ **Count One—Negligence** The defendants who negligently owned, maintained, managed and
    operated the described premises were *(names):*
    Unknown

    ☒ Does 1 _____ to 10 _____

Prem.L-3. ☒ **Count Two—Willful Failure to Warn [Civil Code section 846]** The defendant owners who willfully
    or maliciously failed to guard or warn against a dangerous condition, use, structure, or activity were
    *(names):*
    Unknown

    ☒ Does 1 _____ to 10 _____
    Plaintiff, a recreational user, was ☐ an invited guest ☐ a paying guest.

Prem.L-4. ☒ **Count Three—Dangerous Condition of Public Property** The defendants who owned public property
    on which a dangerous condition existed were *(names):*
    Unknown

    ☒ Does 1 _____ to 10 _____
    a. ☐ The defendant public entity had ☐ actual ☐ constructive notice of the existence of the
    dangerous condition in sufficient time prior to the injury to have corrected it.
    b. ☒ The condition was created by employees of the defendant public entity.

Prem.L-5. a. ☒ **Allegations about Other Defendants** The defendants who were the agents and employees of the
    other defendants and acted within the scope of the agency were *(names):*
    Unknown

    ☒ Does 1 _____ to 10 _____

    b. ☒ The defendants who are liable to plaintiffs for other reasons and the reasons for their liability are
    ☐ described in attachment Prem.L-5.b ☒ as follows *(names):*
    Unknown

Page 1 of 1

Form Approved for Optional Use
Judicial Council of California
PLD-PI-001(4) [Rev. January 1, 2007]    **CAUSE OF ACTION—Premises Liability**    Code of Civil Procedure, § 425.12
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**

STREET ADDRESS: 325 S. Melrose
MAILING ADDRESS: 325 S. Melrose
CITY AND ZIP CODE: Vista, CA 92081
BRANCH NAME: North County
TELEPHONE NUMBER: (760) 806-6348

PLAINTIFF(S) / PETITIONER(S):    William Randol

DEFENDANT(S) / RESPONDENT(S): Harrah's Rincon Resort and Casino

RANDOL VS. HARRAH'S RINCON RESORT AND CASINO

| | |
|---|---|
| **NOTICE OF CASE ASSIGNMENT** | CASE NUMBER:<br>37-2008-00050413-CU-PO-NC |

Judge: Robert P Dahlquist                                    Department: N-29

**COMPLAINT/PETITION FILED:** 01/18/2008

### CASES ASSIGNED TO THE PROBATE DIVISION ARE NOT REQUIRED TO COMPLY WITH THE CIVIL REQUIREMENTS LISTED BELOW

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT).

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

**TIME STANDARDS:** The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time. General civil consists of all cases except: Small claims appeals, petitions, and unlawful detainers.

**COMPLAINTS:** Complaints must be served on all named defendants, and a CERTIFICATE OF SERVICE (SDSC CIV-345) filed within 60 days of filing. This is a mandatory document and may not be substituted by the filing of any other document.

**DEFENDANT'S APPEARANCE:** Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than a 15 day extension which must be in writing and filed with the Court.)

**DEFAULT:** If the defendant has not generally appeared and no extension has been granted, the plaintiff must request default within 45 days of the filing of the Certificate of Service.

THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO LITIGATION, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. MEDIATION SERVICES ARE AVAILABLE UNDER THE DISPUTE RESOLUTION PROGRAMS ACT AND OTHER PROVIDERS. SEE ADR INFORMATION PACKET AND STIPULATION.

YOU MAY ALSO BE ORDERED TO PARTICIPATE IN ARBITRATION PURSUANT TO CCP 1141.10 AT THE CASE MANAGEMENT CONFERENCE. THE FEE FOR THESE SERVICES WILL BE PAID BY THE COURT IF ALL PARTIES HAVE APPEARED IN THE CASE AND THE COURT ORDERS THE CASE TO ARBITRATION PURSUANT TO CCP 1141.10. THE CASE MANAGEMENT CONFERENCE WILL BE CANCELLED IF YOU FILE FORM SDSC CIV-359 PRIOR TO THAT HEARING

SDSC CIV-721 (Rev. 11-06)                                                                              Page: 1

**NOTICE OF CASE ASSIGNMENT**

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO** | **FOR COURT USE ONLY** |
| STREET ADDRESS: 325 S. Melrose | |
| MAILING ADDRESS: 325 S. Melrose | |
| CITY, STATE, & ZIP CODE: Vista, CA 92081-6695 | |
| BRANCH NAME: North County | |

PLAINTIFF(S): William Randol

DEFENDANT(S): Harrah's Rincon Resort and Casino

SHORT TITLE: RANDOL VS. HARRAH'S RINCON RESORT AND CASINO

| **STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION PROCESS** (CRC 3.221) | **CASE NUMBER:** 37-2008-00050413-CU-PO-NC |
|---|---|

Judge: Robert P Dahlquist                                 Department: N-29

The parties and their attorneys stipulate that the matter is at issue and the claims in this action shall be submitted to the following alternative dispute resolution process. Selection of any of these options will not delay any case management time-lines.

☐ Court-Referred Mediation Program            ☐ Court-Ordered Nonbinding Arbitration

☐ Private Neutral Evaluation                  ☐ Court-Ordered Binding Arbitration (Stipulated)

☐ Private Mini-Trial                          ☐ Private Reference to General Referee

☐ Private Summary Jury Trial                  ☐ Private Reference to Judge

☐ Private Settlement Conference with Private Neutral    ☐ Private Binding Arbitration

☐ Other (specify): _____

It is also stipulated that the following shall serve as arbitrator, mediator or other neutral: (Name) _____

_____

_____

Alternate: (mediation & arbitration only) _____

Date: _____                         Date: _____

_____                      _____
Name of Plaintiff                            Name of Defendant

_____                      _____
Signature                                    Signature

_____                      _____
Name of Plaintiff's Attorney                 Name of Defendant's Attorney

_____                      _____
Signature                                    Signature

(Attach another sheet if additional names are necessary). It is the duty of the parties to notify the court of any settlement pursuant to California Rules of Court, 3.1385. Upon notification of the settlement the court will place this matter on a 45-day dismissal calendar.

No new parties may be added without leave of court and all un-served, non-appearing or actions by names parties are dismissed.

IT IS SO ORDERED.

Dated: 01/18/2008                            _____
                                             JUDGE OF THE SUPERIOR COURT

SDSC CIV-359 (Rev 01-07)    **STIPULATION TO USE OF ALTERNATIVE DISPUTE RESOLUTION**    Page: 1

3

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

CASE NUMBER: 37-2008-00050413-CU-PO-NC    CASE TITLE: Randol vs. Harrah's Rincon Resort and Casino

## NOTICE TO LITIGANTS/ADR INFORMATION PACKAGE

You are required to serve a copy of this Notice to Litigants/ADR Information Package and a copy of the blank Stipulation to Alternative Dispute Resolution Process (received from the Civil Business Office at the time of filing) with a copy of the Summons and Complaint on all defendants in accordance with San Diego Superior Court Rule 2.1.5, Division II and CRC Rule 201.9.

## ADR POLICY

It is the policy of the San Diego Superior Court to strongly support the use of Alternative Dispute Resolution ("ADR") in all general civil cases. The court has long recognized the value of early case management intervention and the use of alternative dispute resolution options for amenable and eligible cases. The use of ADR will be discussed at all Case Management Conferences. It is the court's expectation that litigants will utilize some form of ADR – i.e. the court's mediation or arbitration programs or other available private ADR options as a mechanism for case settlement before trial.

## ADR OPTIONS

**1) CIVIL MEDIATION PROGRAM:** The San Diego Superior Court Civil Mediation Program is designed to assist parties with the early resolution of their dispute. All general civil independent calendar cases, including construction defect, complex and eminent domain cases are eligible to participant in the program. Limited civil collection cases are not eligible at this time. San Diego Superior Court Local Rule 2.31, Division II addresses this program specifically. Mediation is a non-binding process in which a trained mediator 1) facilitates communication between disputants, and 2) assists parties in reaching a mutually acceptable resolution of all or part of their dispute. In this process, the mediator carefully explores not only the relevant evidence and law, but also the parties' underlying interests, needs and priorities. The mediator is not the decision-maker and will not resolve the dispute – the parties do. Mediation is a flexible, informal and confidential process that is less stressful than a formalized trial. It can also save time and money, allow for greater client participation and allow for more flexibility in creating a resolution.

**Assignment to Mediation, Cost and Timelines:** Parties may stipulate to mediation at any time up to the CMC or may stipulate to mediation at the CMC. Mediator fees and expenses are split equally by the parties, unless otherwise agreed. Mediators on the court's approved panel have agreed to the court's payment schedule for county-referred mediation: $150.00 per hour for each of the first two hours and their individual rate per hour thereafter. Parties may select any mediator, however, the court maintains a panel of court-approved mediators who have satisfied panel requirements and who must adhere to ethical standards. All court-approved mediator fees and other policies are listed in the Mediator Directory at each court location to assist parties with selection. **Discovery:** Parties do not need to conduct full discovery in the case before mediation is considered, utilized or referred. **Attendance at Mediation:** Trial counsel, parties and all persons with full authority to settle the case must personally attend the mediation, unless excused by the court for good cause.

**2) JUDICIAL ARBITRATION:** Judicial Arbitration is a binding or non-binding process where an arbitrator applies the law to the facts of the case and issues an award. The goal of judicial arbitration is to provide parties with an adjudication that is earlier, faster, less formal and less expensive than trial. The arbitrator's award may either become the judgment in the case if all parties accept or if no trial de novo is requested within the required time. Either party may reject the award and request a trial de novo before the assigned judge if the arbitration was non-binding. If a trial de novo is requested, the trial will usually be scheduled within a year of the filing date.

**Assignment to Arbitration, Cost and Timelines:** Parties may stipulate to binding or non-binding judicial arbitration or the judge may order the matter to arbitration at the case management conference, held approximately 150 days after filing, if a case is valued at under $50,000 and is "at issue". The court maintains a panel of approved judicial arbitrators who have practiced law for a minimum of five years and who have a certain amount of trial and/or arbitration experience. In addition, if parties select an arbitrator from the court's panel, the court will pay the arbitrator's fees. Superior Court

**3) SETTLEMENT CONFERENCES:** The goal of a settlement conference is to assist the parties in their efforts to negotiate a settlement of all or part of the dispute. Parties may, at any time, request a settlement conference before the judge assigned to their case; request another assigned judge or a pro tem to act as settlement officer; or may privately utilize the services of a retired judge. The court may also order a case to a mandatory settlement conference prior to trial before the court's assigned Settlement Conference judge.

**4) OTHER VOLUNTARY ADR:** Parties may voluntarily stipulate to private ADR options outside the court system including private binding arbitration, private early neutral evaluation or private judging at any time by completing the "Stipulation to Alternative Dispute Resolution Process" which is included in this ADR package. Parties may also utilize mediation services offered by programs that are partially funded by the county's Dispute Resolution Programs Act. These services are available at no cost or on a sliding scale based on need. For a list of approved DRPA providers, please contact the County's DRPA program office at (760) 726-4900.

**ADDITIONAL ADR INFORMATION:** For more information about the Civil Mediation Program, please contact the Civil Mediation Department at (619) 515-8908. For more information about the Judicial Arbitration Program, please contact the Arbitration Office at (619) 531-3818. For more information about Settlement Conferences, please contact the Independent Calendar department to which your case is assigned. Please note that staff can only discuss ADR options and cannot give legal advice.

03/10/2008 15:09 FAX 702 407 6286          HARRAH'S LAW DEPARTMENT          @002/012





Corporation Service Co.
2730 Gate Way Oaks Drive, #100
Sacramento, CA. 95833

Earl Tui #,II
222 ASH Street
San Diego, CA. 92101

EXHIBIT 2

05/04/2004 07:34 FAX 7024076    HARRAH'S ENTERTAINMENT    002 

# COPY



# TRIBAL-STATE COMPACT

# BETWEEN

# THE STATE OF CALIFORNIA

# AND THE

# RINCON, SAN LUISENO BAND OF MISSION INDIANS



# TABLE OF CONTENTS

PREAMBLE                                                           1

SECTION 1.0
    PURPOSES AND OBJECTIVES                                     2

SECTION 2.0
    DEFINITIONS                                                 3

SECTION 3.0
    CLASS III GAMING AUTHORIZED AND PERMITTED                   5

SECTION 4.0
    SCOPE OF CLASS III GAMING                                   6

SECTION 5.0
    REVENUE DISTRIBUTION                                        9

SECTION 6.0
    LICENSING                                                  11

SECTION 7.0
    COMPLIANCE ENFORCEMENT                                     21

SECTION 8.0
    RULES AND REGULATIONS FOR THE OPERATION AND
    MANAGEMENT OF THE TRIBAL GAMING OPERATION                  24

SECTION 9.0
    DISPUTE RESOLUTION PROVISIONS                              28

SECTION 10.0
    PUBLIC AND WORKPLACE HEALTH, SAEFTEY
    AND LIABILITY                                              30

SECTION 11.0
    EFFECTIVE DATE AND TERM OF COMPACT                         35

SECTION 12.0
        AMENDMENTS; RENEGOTIATIONS                          36

SECTION 13.0
        NOTICES                                             37

SECTION 14.0
        CHANGES IN IGRA                                     37

SECTION 15.0
        MISCELLANEOUS                                       37

ATTACHMENTS:
ADDENDUM A
ADDENDUM B
NOTICE OF ADOPTION OF MODEL TRIBAL LABOR RELATIONS ORDINANCE
MODEL TRIBAL LABOR RELATIONS ORDINANCE



05/04/2004 07:35 FAX 7024076   HARRAH'S ENTERTAINMEN                    ☒005

# TRIBAL-STATE GAMING COMPACT

Between the RINCON BAND OF MISSION INDIANS, a federally recognized Indian Tribe,

## and the
## STATE OF CALIFORNIA

This Tribal-State Gaming Compact is entered into on a government-to-government basis by and between the Rincon Band of Mission Indians, a federally-recognized sovereign Indian tribe (hereafter "Tribe"), and the State of California, a sovereign State of the United States (hereafter "State"), pursuant to the Indian Gaming Regulatory Act of 1988 (P.L. 100-497, codified at 18 U.S.C. Sec. 1166 et seq. and 25 U.S.C. Sec. 2701 et seq.) (hereafter "IGRA"), and any successor statute or amendments.

## PREAMBLE

A.  In 1988, Congress enacted IGRA as the federal statute governing Indian gaming in the United States. The purposes of IGRA are to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments; to provide a statutory basis for regulation of Indian gaming adequate to shield it from organized crime and other corrupting influences; to ensure that the Indian tribe is the primary beneficiary of the gaming operation; to ensure that gaming is conducted fairly and honestly by both the operator and players; and to declare that the establishment of an independent federal regulatory authority for gaming on Indian lands, federal standards for gaming on Indian lands, and a National Indian Gaming Commission are necessary to meet congressional concerns.

B.   The system of regulation of Indian gaming fashioned by Congress in IGRA rests on an allocation of regulatory jurisdiction among the three sovereigns involved: the federal government, the state in which a tribe has land, and the tribe itself.  IGRA makes Class III gaming activities lawful on the lands of federally-recognized Indian tribes only if such activities are:  (1) authorized by a tribal ordinance, (2) located in a state that permits such gaming for any purpose by any person, organization or entity, and (3) conducted in conformity with a gaming compact entered into between the Indian tribe and the state and approved by the Secretary of the Interior.

1



C.    The Tribe does not currently operate a gaming facility that offers Class III gaming activities. However, on or after the effective date of this Compact, the Tribe intends to develop and operate a gaming facility offering Class III gaming activities on its reservation land, which is located in San Diego County of California.

D.    The State enters into this Compact out of respect for the sovereignty of the Tribe; in recognition of the historical fact that Indian gaming has become the single largest revenue-producing activity for Indian tribes in the United States; out of a desire to terminate pending "bad faith" litigation between the Tribe and the State; to initiate a new era of tribal-state cooperation in areas of mutual concern; out of a respect for the sentiment of the voters of California who, in approving Proposition 5, expressed their belief that the forms of gaming authorized herein should be allowed; and in anticipation of voter approval of SCA 11 as passed by the California legislature.

E.    The exclusive rights that Indian tribes in California, including the Tribe, will enjoy under this Compact create a unique opportunity for the Tribe to operate its Gaming Facility in an economic environment free of competition from the Class III gaming referred to in Section 4.0 of this Compact on non-Indian lands in California. The parties are mindful that this unique environment is of great economic value to the Tribe and the fact that income from Gaming Devices represents a substantial portion of the tribes' gaming revenues. In consideration for the exclusive rights enjoyed by the tribes, and in further consideration for the State's willingness to enter into this Compact, the tribes have agreed to provide to the State, on a sovereign-to-sovereign basis, a portion of its revenue from Gaming Devices.

F.    The State has a legitimate interest in promoting the purposes of IGRA for all federally-recognized Indian tribes in California, whether gaming or non-gaming. The State contends that it has an equally legitimate sovereign interest in regulating the growth of Class III gaming activities in California. The Tribe and the State share a joint sovereign interest in ensuring that tribal gaming activities are free from criminal and other undesirable elements.

Section 1.0. PURPOSES AND OBJECTIVES.

The terms of this Gaming Compact are designed and intended to:

(a) Evidence the goodwill and cooperation of the Tribe and State in fostering a mutually respectful government-to-government relationship that will serve the mutual interests of the parties.

(b) Develop and implement a means of regulating Class III gaming, and only Class III gaming, on the Tribe's Indian lands to ensure its fair and honest operation in accordance with IGRA, and through that regulated Class III gaming, enable the Tribe to develop self-sufficiency, promote tribal economic development, and generate jobs and revenues to support the Tribe's government and governmental services and programs.

(c) Promote ethical practices in conjunction with that gaming, through the licensing and control of persons and entities employed in, or providing goods and services to, the Tribe's Gaming Operation and protecting against the presence or participation of persons whose criminal backgrounds, reputations, character, or associations make them unsuitable for participation in gaming, thereby maintaining a high level of integrity in tribal government gaming.

Sec. 2.0. DEFINITIONS.

Sec. 2.1. "Applicant" means an individual or entity that applies for a Tribal license or State certification.

Sec. 2.2. "Association" means an association of California tribal and state gaming regulators, the membership of which comprises up to two representatives from each tribal gaming agency of those tribes with whom the State has a gaming compact under IGRA, and up to two delegates each from the state Division of Gambling Control and the state Gambling Control Commission.

Sec. 2.3. "Class III gaming" means the forms of Class III gaming defined as such in 25 U.S.C. Sec. 2703(8) and by regulations of the National Indian Gaming Commission.

Sec. 2.4. "Gaming Activities" means the Class III gaming activities authorized under this Gaming Compact.

Sec. 2.5. "Gaming Compact" or "Compact" means this compact.

Sec. 2.6. "Gaming Device" means a slot machine, including an electronic, electromechanical, electrical, or video device that, for consideration, permits: individual play with or against that device or the participation in any electronic, electromechanical, electrical, or video system to which that device is connected; the playing of games thereon or therewith, including, but not limited to, the playing of facsimiles of games of chance or skill; the possible delivery of, or entitlement by the player to, a prize or something of value as a result of the application of an element of

3

chance; and a method for viewing the outcome, prize won, and other information regarding the playing of games thereon or therewith.

Sec. 2.7. "Gaming Employee" means any person who (a) operates, maintains, repairs, assists in any Class III gaming activity, or is in any way responsible for supervising such gaming activities or persons who conduct, operate, account for, or supervise any such gaming activity, (b) is in a category under federal or tribal gaming law requiring licensing, (c) is an employee of the Tribal Gaming Agency with access to confidential information, or (d) is a person whose employment duties require or authorize access to areas of the Gaming Facility that are not open to the public.

Sec. 2.8. "Gaming Facility" or "Facility" means any building in which Class III gaming activities or gaming operations occur, or in which the business records, receipts, or other funds of the gaming operation are maintained (but excluding offsite facilities primarily dedicated to storage of those records, and financial institutions), and all rooms, buildings, and areas, including parking lots and walkways, a principal purpose of which is to serve the activities of the Gaming Operation, provided that nothing herein prevents the conduct of Class II gaming (as defined under IGRA) therein.

Sec. 2.9. "Gaming Operation" means the business enterprise that offers and operates Class III Gaming Activities, whether exclusively or otherwise.

Sec. 2.10. "Gaming Ordinance" means a tribal ordinance or resolution duly authorizing the conduct of Class III Gaming Activities on the Tribe's Indian lands and approved under IGRA.

Sec. 2.11. "Gaming Resources" means any goods or services provided or used in connection with Class III Gaming Activities, whether exclusively or otherwise, including, but not limited to, equipment, furniture, gambling devices and ancillary equipment, implements of gaming activities such as playing cards and dice, furniture designed primarily for Class III gaming activities, maintenance or security equipment and services, and Class III gaming consulting services. "Gaming Resources" does not include professional accounting and legal services.

Sec. 2.12. "Gaming Resource Supplier" means any person or entity who, directly or indirectly, manufactures, distributes, supplies, vends, leases, or otherwise purveys Gaming Resources to the Gaming Operation or Gaming Facility, provided that the Tribal Gaming Agency may exclude a purveyor of equipment or furniture that is not specifically designed for, and is distributed generally for use other than in connection with, Gaming Activities, if the purveyor is not otherwise a Gaming Resource Supplier as described by of Section 6.4.5, the compensation received by the

05/04/2004 07:37 FAX 70240762    HARRAH'S ENTERTAINMENT    ☐009

purveyor is not grossly disproportionate to the value of the goods or services provided, and the purveyor is not otherwise a person who exercises a significant influence over the Gambling Operation.

Sec. 2.13. "IGRA" means the Indian Gaming Regulatory Act of 1988 (P.L. 100-497, 18 U.S.C. Sec. 1166 et seq. and 25 U.S.C. Sec. 2701 et seq.) any amendments thereto, and all regulations promulgated thereunder.

Sec. 2.14. "Management Contractor" means, any Gaming Resource Supplier with whom the Tribe has contracted for the management of any Gaming Activity or Gaming Facility, including, but not limited to, any person who would be regarded as a management contractor under IGRA.

Sec. 2.15. "Net Win" means "net win" as defined by American Institute of Certified Public Accountants.

Sec. 2.16. "NIGC" means the National Indian Gaming Commission.

Sec. 2.17. "State" means the State of California or an authorized official or agency thereof.

Sec. 2.18. "State Gaming Agency" means the entities authorized to investigate, approve, and regulate gaming licenses pursuant to the Gambling Control Act (Chapter 5 (commencing with Section 19800) of Division 8 of the Business and Professions Code).

Sec. 2.19. "Tribal Chairperson" means the person duly elected or selected under the Tribe's organic documents, customs, or traditions to serve as the primary spokesperson for the Tribe.

Sec. 2.20. "Tribal Gaming Agency" means the person, agency, board, committee, commission, or council designated under tribal law, including, but not limited to, an intertribal gaming regulatory agency approved to fulfill those functions by the National Indian Gaming Commission, as primarily responsible for carrying out the Tribe's regulatory responsibilities under IGRA and the Tribal Gaming Ordinance. No person employed in, or in connection with, the management, supervision, or conduct of any gaming activity may be a member or employee of the Tribal Gaming Agency.

Sec. 2.21. "Tribe" means the Rincon Band of Mission Indians, a federally-recognized Indian tribe, or an authorized official or agency thereof.

Sec. 3.0 CLASS III GAMING AUTHORIZED AND PERMITTED. The Tribe is hereby authorized and permitted to engage in only the Class III Gaming Activities expressly referred to in Section 4.0 and shall not engage in Class III gaming that is not expressly authorized in that Section.

 @010

### Sec. 4.0. SCOPE OF CLASS III GAMING.

Sec. 4.1. Authorized and Permitted Class III gaming.  The Tribe is hereby authorized and permitted to operate the following Gaming Activities under the terms and conditions set forth in this Gaming Compact:

(a) The operation of Gaming Devices.

(b) Any banking or percentage card game.

(c) The operation of any devices or games that are authorized under state law to the California State Lottery, provided that the Tribe will not offer such games through use of the Internet unless others in the state are permitted to do so under state and federal law.

(e) Nothing herein shall be construed to preclude negotiation of a separate compact governing the conduct of off-track wagering at the Tribe's Gaming Facility.

Sec. 4.2. Authorized Gaming Facilities. The Tribe may establish and operate not more than two Gaming Facilities, and only on those Indian lands on which gaming may lawfully be conducted under the Indian Gaming Regulatory Act. The Tribe may combine and operate in each Gaming Facility any forms and kinds of gaming permitted under law, except to the extent limited under IGRA, this Compact, or the Tribe's Gaming Ordinance.

Sec. 4.3.    Sec. 4.3. Authorized number of Gaming Devices

Sec. 4.3.1 The Tribe may operate no more Gaming Devices than the larger of the following:

(a) A number of terminals equal to the number of Gaming Devices operated by the Tribe on September 1, 1999; or

(b) Three hundred fifty (350) Gaming Devices.

Sec. 4.3.2. Revenue Sharing with Non-Gaming Tribes.

(a)  For the purposes of this Section 4.3.2 and Section 5.0, the following definitions apply:

(i) A "Compact Tribe" is a tribe having a compact with the State that authorizes the Gaming Activities authorized by this Compact.  Federally-recognized tribes that are operating fewer than 350 Gaming Devices are "Non-Compact Tribes."  Non-Compact Tribes shall be deemed third party beneficiaries of this and other compacts identical in all material respects.  A Compact Tribe that becomes a Non-Compact Tribe may not thereafter return to the status of a Compact Tribe for a period of two years becoming a Non-Compact Tribe.

(ii) The Revenue Sharing Trust Fund is a fund created by the Legislature and administered by the California Gambling Control Commission, as Trustee, for the receipt, deposit, and distribution of monies paid pursuant to this Section 4.3.2.

(iii) The Special Distribution Fund is a fund created by the Legislature for the receipt, deposit, and distribution of monies paid pursuant to Section 5.0.

Sec. 4.3.2.1. Revenue Sharing Trust Fund.

(a) The Tribe agrees with all other Compact Tribes that are parties to compacts having this Section 4.3.2, that each Non-Compact Tribe in the State shall receive the sum of $1.1 million per year. In the event there are insufficient monies in the Revenue Sharing Trust Fund to pay $1.1 million per year to each Non-Compact Tribe, any available monies in that Fund shall be distributed to Non-Compact Tribes in equal shares. Monies in excess of the amount necessary to $1.1 million to each Non-Compact Tribe shall remain in the Revenue Sharing Trust Fund available for disbursement in future years.

(b) Payments made to Non-Compact Tribes shall be made quarterly and in equal shares out of the Revenue Sharing Trust Fund. The Commission shall serve as the trustee of the fund. The Commission shall have no discretion with respect to the use or disbursement of the trust funds. Its sole authority shall be to serve as a depository of the trust funds and to disburse them on a quarterly basis to Non-Compact Tribes. In no event shall the State's General Fund be obligated to make up any shortfall or pay any unpaid claims.

Sec. 4.3.2.2. Allocation of Licenses.

(a) The Tribe, along with all other Compact Tribes, may acquire licenses to use Gaming Devices in excess of the number they are authorized to use under Sec. 4.3.1, but in no event may the Tribe operate more than 2,000 Gaming Devices, on the following terms, conditions, and priorities:

(1). The maximum number of machines that all Compact Tribes in the aggregate may license pursuant to this Section shall be a sum equal to 350 multiplied by the number of Non-Compact tribes as of September 1, 1999, plus the difference between 350 and the lesser number authorized under Section 4.3.1.

(2) The Tribe may acquire and maintain a license to operate a Gaming Device by paying into the Revenue Sharing Trust Fund, on a quarterly basis, in the following amounts:

7

05/04/2004 07:39 FAX 7024076    HARRAH'S ENTERTAINMENT    ☑012

| Number of Licensed Devices | Fee Per Device Per Annum |
|---|---|
| 1-350 | $0 |
| 351-750 | $900 |
| 751-1250 | $1950 |
| 1251-2000 | $4350 |

(3) Licenses to use Gaming Devices shall be awarded as follows:

(i) First, Compact Tribes with no Existing Devices (i.e., the number of Gaming Devices operated by a Compact Tribe as of September 1, 1999) may draw up to 150 licenses for a total of 500 Gaming Devices;

(ii) Next, Compact Tribes authorized under Section 4.3.1 to operate up to and including 500 Gaming Devices as of September 1, 1999 (including tribes, if any, that have acquired licenses through subparagraph (i)), may draw up to an additional 500 licenses, to a total of 1000 Gaming Devices;

(iii) Next, Compact Tribes operating between 501 and 1000 Gaming Devices as of September 1, 1999 (including tribes, if any, that have acquired licenses through subparagraph (ii)), shall be entitled to draw up to an additional 750 Gaming Devices;

(iv) Next, Compact Tribes authorized to operate up to and including 1500 gaming devices (including tribes, if any, that have acquired licenses through subparagraph (iii)), shall be entitled to draw up to an additional 500 licenses, for a total authorization to operate up to 2000 gaming devices.

(v) Next, Compact Tribes authorized to operate more than 1500 gaming devices (including tribes, if any, that have acquired licenses through subparagraph (iv)), shall be entitled to draw additional licenses up to a total authorization to operate up to 2000 gaming devices.

(vi). After the first round of draws, a second and subsequent round(s) shall be conducted utilizing the same order of priority as set forth above. Rounds shall continue until tribes cease making draws, at which time draws will be discontinued for one month or until the Trustee is notified that a tribe desires to acquire a license, whichever last occurs.

8

05/04/2004 07:39 FAX 7024076   HARRAH'S ENTERTAINMENT   ☒013



(e) As a condition of acquiring licenses to operate Gaming Devices, a non-refundable one-time pre-payment fee shall be required in the amount of $1,250 per Gaming Device being licensed, which fees shall be deposited in the Revenue Sharing Trust Fund.   The license for any Gaming Device shall be canceled if the Gaming Device authorized by the license is not in commercial operation within twelve months of issuance of the license.

Sec. 4.3.2.3. The Tribe shall not conduct any Gaming Activity authorized by this Compact if the Tribe is more than two quarterly contributions in arrears in its license fee payments to the Revenue Sharing Trust Fund.

Sec. 4.3.3.   If requested to do so by either party after March 7, 2003, but not later than March 31, 2003, the parties will promptly commence negotiations in good faith with the Tribe concerning any matters encompassed by Sections 4.3.1 and Section 4.3.2, and their subsections.

SEC. 5.0 REVENUE DISTRIBUTION

Sec. 5.1.  (a) The Tribe shall make contributions to the Special Distribution Fund created by the Legislature, in accordance with the following schedule, but only with respect to the number of Gaming Devices operated by the Tribe on September 1, 1999:

| Number of Terminals in Quarterly Device Base | Percent of Average Gaming Device Net Win |
| --- | --- |
| 1 - 200 | 0% |
| 201 – 500 | 7% |
| 501 – 1000 | 7% applied to the excess over 200 terminals, up to 500 terminals, plus 10% applied to terminals over 500 terminals, up to 1000 terminals. |
| 1000+ | 7% applied to excess over 200, up to 500 terminals, plus 10% applied to terminals over 500, up to 1000 terminals, plus 13% applied to the excess above 1000 terminals. |

05/04/2004 07:40 FAX 702407   5    HARRAH'S ENTERTAINMEN    014

(b) The first transfer to the Special Distribution Fund of its share of the gaming revenue shall made at the conclusion of the first calendar quarter following the second anniversary date of the effective date of this Compact.

Sec. 5.2. Use of funds. The State's share of the Gaming Device revenue shall be placed in the Special Distribution Fund, available for appropriation by the Legislature for the following purposes: (a) grants, including any administrative costs, for programs designed to address gambling addiction; (b) grants, including any administrative costs, for the support of state and local government agencies impacted by tribal government gaming; (c) compensation for regulatory costs incurred by the State Gaming Agency and the state Department of Justice in connection with the implementation and administration of the Compact; (d) payment of shortfalls that may occur in the Revenue Sharing Trust Fund; and (e) any other purposes specified by the Legislature. It is the intent of the parties that Compact Tribes will be consulted in the process of identifying purposes for grants made to local governments.

Sec. 5.3.  (a) The quarterly contributions due under Section 5.1 shall be determined and made not later than the thirtieth (30th) day following the end of each calendar quarter by first determining the total number of all Gaming Devices operated by a Tribe during a given quarter ("Quarterly Device Base"). The "Average Device Net Win" is calculated by dividing the total Net Win from all terminals during the quarter by the Quarterly Terminal Base.

(b)  Any quarterly contribution not paid on or before the date on which such amount is due shall be deemed overdue. If any quarterly contribution under Section 5.1 is overdue to the Special Distribution Fund, the Tribe shall pay to the Special Distribution Fund, in addition to the overdue quarterly contribution, interest on such amount from the date the quarterly contribution was due until the date such quarterly contribution (together with interest thereon) was actually paid at the rate of 1.0% per month or the maximum rate permitted by state law, whichever is less. Entitlement to such interest shall be in addition to any other remedies the State may have.

(c) At the time each quarterly contribution is made, the Tribe shall submit to the State a report (the "Quarterly Contribution Report") certified by an authorized representative of the Tribe reflecting the Quarterly Device Base, the Net Win from all terminals in the Quarterly Device Base (broken down by Gaming Device), and the Average Device Net Win.

(d) If the State causes an audit to be made pursuant to subdivision (c), and the Average Device Net Win for any quarter as reflected on such quarter's Quarterly

10

Contribution Reports is found to be understated, the State will promptly notify the Tribe, and the Tribe will either accept the difference or provide a reconciliation satisfactory to the State. If the Tribe accepts the difference or does not provide a reconciliation satisfactory to the State, the Tribe must immediately pay the amount of the resulting deficiencies in the quarterly contribution plus interest on such amounts from the date they were due at the rate of 1.0% per month or the maximum rate permitted by applicable law, whichever is less.

(e) The Tribe shall not conduct Class III gaming if more than two quarterly contributions to the Special Distribution Fund are overdue.

Sec. 6.0.  LICENSING.

Sec. 6.1. Gaming Ordinance and Regulations. All Gaming Activities conducted under this Gaming Compact shall, at a minimum, comply with a Gaming Ordinance duly adopted by the Tribe and approved in accordance with IGRA, and with all rules, regulations, procedures, specifications, and standards duly adopted by the Tribal Gaming Agency.

Sec. 6.2. Tribal Ownership, Management, and Control of Gaming Operation. The Gaming Operations authorized under this Gaming Compact shall be owned solely by the Tribe.

Sec. 6.3. Prohibition Regarding Minors. (a) Except as provided in subdivision (b), the Tribe shall not permit persons under the age of 18 years to be present in any room in which Class III Gaming Activities are being conducted unless the person is en-route to a non-gaming area of the Gaming Facility.

(b) If the Tribe permits the consumption of alcoholic beverages in the Gaming Facility, the Tribe shall prohibit persons under the age of 21 years from being present in any area in which Class III gaming activities are being conducted and in which alcoholic beverages may be consumed, to the extent required by the state Department of Alcoholic Beverage Control.

Sec. 6.4. Licensing Requirements and Procedures.

Sec. 6.4.1. Summary of Licensing Principles. All persons in any way connected with the Gaming Operation or Facility who are required to be licensed or to submit to a background investigation under IGRA, and any others required to be licensed under this Gaming Compact, including, but not limited to, all Gaming Employees and Gaming Resource Suppliers, and any other person having a significant influence over the Gaming Operation must be licensed by the Tribal Gaming Agency. The parties intend that the licensing process provided for in this Gaming Compact shall involve


joint cooperation between the Tribal Gaming Agency and the State Gaming Agency, as more particularly described herein.

Sec. 6.4.2. Gaming Facility. (a) The Gaming Facility authorized by this Gaming Compact shall be licensed by the Tribal Gaming Agency in conformity with the requirements of this Gaming Compact, the Tribal Gaming Ordinance, and IGRA. The license shall be reviewed and renewed, if appropriate, every two years thereafter. Verification that this requirement has been met shall be provided by the Tribe to the State Gaming Agency every two years. The Tribal Gaming Agency's certification to that effect shall be posted in a conspicuous and public place in the Gaming Facility at all times.

(b) In order to protect the health and safety of all Gaming Facility patrons, guests, and employees, all Gaming Facilities of the Tribe constructed after the effective date of this Gaming Compact, and all expansions or modifications to a Gaming Facility in operation as of the effective date of this Compact, shall meet the building and safety codes of the Tribe, which, as a condition for engaging in that construction, expansion, modification, or renovation, shall amend its existing building and safety codes if necessary, or enact such codes if there are none, so that they meet the standards of either the building and safety codes of any county within the boundaries of which the site of the Facility is located, or the Uniform Building Codes, including all uniform fire, plumbing, electrical, mechanical, and related codes then in effect provided that nothing herein shall be deemed to confer jurisdiction upon any county or the State with respect to any reference to such building and safety codes.   Any such construction, expansion or modification will also comply with the federal Americans with Disabilities Act, P.L. 101-336, as amended, 42 U.S.C. § 12101 et seq.

(c) Any Gaming Facility in which gaming authorized by this Gaming Compact is conducted shall be issued a certificate of occupancy by the Tribal Gaming Agency prior to occupancy if it was not used for any Gaming Activities under IGRA prior to the effective date of this Gaming Compact, or, if it was so used, within one year thereafter. The issuance of this certificate shall be reviewed for continuing compliance every two years thereafter. Inspections by qualified building and safety experts shall be conducted under the direction of the Tribal Gaming Agency as the basis for issuing any certificate hereunder. The Tribal Gaming Agency shall determine and certify that, as to new construction or new use for gaming, the Facility meets the Tribe's building and safety code, or, as to facilities or portions of facilities that were used for the Tribe's Gaming Activities prior to this Gaming Compact, that the facility or portions thereof do not endanger the health or safety of occupants or the integrity of the

Gaming Operation. The Tribe will not offer Class III gaming in a Facility that is constructed or maintained in a manner that endangers the health or safety of occupants or the integrity of the gaming operation.

(d) The State shall designate an agent or agents to be given reasonable notice of each inspection by the Tribal Gaming Agency's experts, which state agents may accompany any such inspection. The Tribe agrees to correct any Gaming Facility condition noted in an inspection that does not meet the standards set forth in subdivisions (b) and (c). The Tribal Gaming Agency and the State's designated agent or agents shall exchange any reports of an inspection within 10 days after completion of the report, which reports shall also be separately and simultaneously forwarded by both agencies to the Tribal Chairperson. Upon certification by the Tribal Gaming Agency's experts that a Gaming Facility meets applicable standards, the Tribal Gaming Agency shall forward the experts' certification to the State within 10 days of issuance. If the State's agent objects to that certification, the Tribe shall make a good faith effort to address the State's concerns, but if the State does not withdraw its objection, the matter will be resolved in accordance with the dispute resolution provisions of Section 9.0.

Sec. 6.4.3. Suitability Standard Regarding Gaming Licenses.(a) In reviewing an application for a gaming license, and in addition to any standards set forth in the Tribal Gaming Ordinance, the Tribal Gaming Agency shall consider whether issuance of the license is inimical to public health, safety, or welfare, and whether issuance of the license will undermine public trust that the Tribe's Gaming Operations, or tribal government gaming generally, are free from criminal and dishonest elements and would be conducted honestly. A license may not be issued unless, based on all information and documents submitted, the Tribal Gaming Agency is satisfied that the applicant is all of the following, in addition to any other criteria in IGRA or the Tribal Gaming Ordinance:

(a) A person of good character, honesty, and integrity.

(b) A person whose prior activities, criminal record (if any), reputation, habits, and associations do not pose a threat to the public interest or to the effective regulation and control of gambling, or create or enhance the dangers of unsuitable, unfair, or illegal practices, methods, or activities in the conduct of gambling, or in the carrying on of the business and financial arrangements incidental thereto.

(c) A person who is in all other respects qualified to be licensed as provided in this Gaming Compact, IGRA, the Tribal Gaming Ordinance, and any other criteria adopted by the Tribal Gaming Agency or the Tribe. An applicant shall not be found to be

13

05/04/2004 07:42 FAX 70240762    HARRAH'S ENTERTAINMENT    ☒018

unsuitable solely on the ground that the applicant was an employee of a tribal gaming operation in California that was conducted prior to the effective date of this Compact.

Sec. 6.4.4. Gaming Employees. (a) Every Gaming Employee shall obtain, and thereafter maintain current, a valid tribal gaming license, which shall be subject to biennial renewal; provided that in accordance with Section 6.4.9, those persons may be employed on a temporary or conditional basis pending completion of the licensing process.

(b) Except as provided in subdivisions (c) and (d), the Tribe will not employ or continue to employ, any person whose application to the State Gaming Agency for a determination of suitability, or for a renewal of such a determination, has been denied or has expired without renewal.

(c) Notwithstanding subdivision (a), the Tribe may retain in its employ a person whose application for a determination of suitability, or for a renewal of such a determination, has been denied by the State Gaming Agency, if: (i) the person holds a valid and current license issued by the Tribal Gaming Agency that must be renewed at least biennially; (ii) the denial of the application by the State Gaming Agency is based solely on activities, conduct, or associations that antedate the filing of the person's initial application to the State Gaming Agency for a determination of suitability; (iii) the person is not an employee or agent of any other gaming operation; and (iv) the person has been in the continuous employ of the Tribe for at least three years prior to the effective date of this Compact.

(d) Notwithstanding subdivision (a), the Tribe may employ or retain in its employ a person whose application for a determination of suitability, or for a renewal of such a determination, has been denied by the State Gaming Agency, if the person is an enrolled member of the Tribe, as defined in this subdivision, and if (i) the person holds a valid and current license issued by the Tribal Gaming Agency that must be renewed at least biennially; (ii) the denial of the application by the State Gaming Agency is based solely on activities, conduct, or associations that antedate the filing of the person's initial application to the State Gaming Agency for a determination of suitability; and (iii) the person is not an employee or agent of any other gaming operation. For purposes of this subdivision, "enrolled member" means a person who is either (a) certified by the Tribe as having been a member of the Tribe for at least five (5) years, or (b) a holder of confirmation of membership issued by the Bureau of Indian Affairs.

(e) Nothing herein shall be construed to relieve any person of the obligation to apply for a renewal of a determination of suitability as required by Section 6.5.6.

Sec. 6.4.5. Gaming Resource Supplier. Any Gaming Resource Supplier who, directly or indirectly, provides, has provided, or is deemed likely to provide at least twenty-five thousand dollars ($25,000) in Gaming Resources in any 12month period, or who has received at least twenty-five thousand dollars ($25,000) in any consecutive 12-month period within the 24-month period immediately preceding application, shall be licensed by the Tribal Gaming Agency prior to the sale, lease, or distribution, or further sale, lease, or distribution, of any such Gaming Resources to or in connection with the Tribe's Operation or Facility. These licenses shall be reviewed at least every two years for continuing compliance. In connection with such a review, the Tribal Gaming Agency shall require the Supplier to update all information provided in the previous application. For purposes of Section 6.5.2, such a review shall be deemed to constitute an application for renewal. The Tribe shall not enter into, or continue to make payments pursuant to, any contract or agreement for the provision of Gaming Resources with any person whose application to the State Gaming Agency for a determination of suitability has been denied or has expired without renewal. Any agreement between the Tribe and a Gaming Resource Supplier shall be deemed to include a provision for its termination without further liability on the part of the Tribe, except for the bona fide repayment of all outstanding sums (exclusive of interest) owed as of, or payment for services or materials received up to, the date of termination, upon revocation or non-renewal of the Supplier's license by the Tribal Gaming Agency based on a determination of unsuitability by the State Gaming Agency.

Sec. 6.4.6. Financial Sources. Any person extending financing, directly or indirectly, to the Tribe's Gaming Facility or Gaming Operation shall be licensed by the Tribal Gaming Agency prior to extending that financing, provided that any person who is extending financing at the time of the execution of this Compact shall be licensed by the Tribal Gaming Agency within ninety (90) days of such execution. These licenses shall be reviewed at least every two years for continuing compliance. In connection with such a review, the Tribal Gaming Agency shall require the Financial Source to update all information provided in the previous application. For purposes of Section 6.5.2, such a review shall be deemed to constitute an application for renewal. Any agreement between the Tribe and a Financial Source shall be deemed to include a provision for its termination without further liability on the part of the Tribe, except for the bona fide repayment of all outstanding sums (exclusive of interest) owed as of the date of termination, upon revocation or non-renewal of the Financial Source's license by the Tribal Gaming Agency based on a determination of

08/04/2004 07:43 FAX 702407 85          HARRAH'S ENTERTAINME                    Ø020

unsuitability by the State Gaming Agency. The Tribe shall not enter into, or continue to make payments pursuant to, any contract or agreement for the provision of financing with any person whose application to the State Gaming Agency for a determination of suitability has been denied or has expired without renewal. A Gaming Resource Supplier who provides financing exclusively in connection with the sale or lease of Gaming Resources obtained from that Supplier may be licensed solely in accordance with licensing procedures applicable, if at all, to Gaming Resource Suppliers. The Tribal Gaming Agency may, at its discretion, exclude from the licensing requirements of this section, financing provided by a federally regulated or state-regulated bank, savings and loan, or other federally- or state-regulated lending institution; or any agency of the federal, state, or local government; or any investor who, alone or in conjunction with others, holds less than 10% of any outstanding indebtedness evidenced by bonds issued by the Tribe.

Sec. 6.4.7. Processing Tribal Gaming License Applications. Each applicant for a tribal gaming license shall submit the completed application along with the required information and an application fee, if required, to the Tribal Gaming Agency in accordance with the rules and regulations of that agency. At a minimum, the Tribal Gaming Agency shall require submission and consideration of all information required under IGRA, including Section 556.4 of Title 25 of the Code of Federal Regulations, for licensing primary management officials and key employees. For applicants who are business entities, these licensing provisions shall apply to the entity as well as: (i) each of its officers and directors; (ii) each of its principal management employees, including any chief executive officer, chief financial officer, chief operating officer, and general manager; (iii) each of its owners or partners, if an unincorporated business; (iv) each of its shareholders who owns more than 10 percent of the shares of the corporation, if a corporation; and (v) each person or entity (other than a financial institution that the Tribal Gaming Agency has determined does not require a license under the preceding section) that, alone or in combination with others, has provided financing in connection with any gaming authorized under this Gaming Compact, if that person or entity provided more than 10 percent of (a) the start-up capital, (b) the operating capital over a 12-month period, or (c) a combination thereof. For purposes of this Section, where there is any commonality of the characteristics identified in clauses (i) to (v), inclusive, between any two or more entities, those entities may be deemed to be a single entity. Nothing herein precludes the Tribe or Tribal Gaming Agency from requiring more stringent licensing requirements.

05/04/2004 07:43 FAX 7024076286    HARRAH'S ENTERTAINMENT    ☒021

Sec. 6.4.8. Background Investigations of Applicants. The Tribal Gaming Agency shall conduct or cause to be conducted all necessary background investigations reasonably required to determine that the applicant is qualified for a gaming license under the standards set forth in Section 6.4.3, and to fulfill all requirements for licensing under IGRA, the Tribal Gaming Ordinance, and this Gaming Compact. The Tribal Gaming Agency shall not issue other than a temporary license until a determination is made that those qualifications have been met. In lieu of completing its own background investigation, and to the extent that doing so does not conflict with or violate IGRA or the Tribal Gaming Ordinance, the Tribal Gaming Agency may contract with the State Gaming Agency for the conduct of background investigations, may rely on a state certification of non-objection previously issued under a gaming compact involving another tribe, or may rely on a State gaming license previously issued to the applicant, to fulfill some or all of the Tribal Gaming Agency's background investigation obligation. An applicant for a tribal gaming license shall be required to provide releases to the State Gaming Agency to make available to the Tribal Gaming Agency background information regarding the applicant. The State Gaming Agency shall cooperate in furnishing to the Tribal Gaming Agency that information, unless doing so would violate any agreement the State Gaming Agency has with a source of the information other than the applicant, or would impair or impede a criminal investigation, or unless the Tribal Gaming Agency cannot provide sufficient safeguards to assure the State Gaming Agency that the information will remain confidential or that provision of the information would violate state or federal law. If the Tribe adopts an ordinance confirming that Article 6 (commencing with section 11140) of Chapter 1 of Title 1 of Part 4 of the California Penal Code is applicable to members, investigators, and staff of the Tribal Gaming Agency, and those members, investigators, and staff thereafter comply with that ordinance, then, for purposes of carrying out its obligations under this Section, the Tribal Gaming Agency shall be considered to be an entity entitled to receive state summary criminal history information within the meaning of subdivision (b)(12) of section 11105 of the California Penal Code. The California Department of Justice shall provide services to the Tribal Gaming Agency through the California Law Enforcement Telecommunications System (CLETS), subject to a determination by the CLETS advisory committee that the Tribal Gaming Agency is qualified for receipt of such services, and on such terms and conditions as are deemed reasonable by that advisory committee.

17

Sec. 6.4.9. Temporary Licensing of Gaming Employees. Notwithstanding anything herein to the contrary, if the applicant has completed a license application in a manner satisfactory to the Tribal Gaming Agency, and that agency has conducted a preliminary background investigation, and the investigation or other information held by that agency does not indicate that the applicant has a criminal history or other information in his or her background that would either automatically disqualify the applicant from obtaining a license or cause a reasonable person to investigate further before issuing a license, or is otherwise unsuitable for licensing, the Tribal Gaming Agency may issue a temporary license and may impose such specific conditions thereon pending completion of the applicant's background investigation, as the Tribal Gaming Agency in its sole discretion shall determine. Special fees may be required by the Tribal Gaming Agency to issue or maintain a temporary license. A temporary license shall remain in effect until suspended or revoked, or a final determination is made on the application. At any time after issuance of a temporary license, the Tribal Gaming Agency may suspend or revoke it in accordance with Sections 6.5.1 or 6.5.5, and the State Gaming Agency may request suspension or revocation in accordance with subdivision (d) of Section 6.5.6. Nothing herein shall be construed to relieve the Tribe of any obligation under Part 558 of Title 25 of the Code of Federal Regulations.

Sec. 6.5. Gaming License Issuance. Upon completion of the necessary background investigation, the Tribal Gaming Agency may issue a license on a conditional or unconditional basis. Nothing herein shall create a property or other right of an applicant in an opportunity to be licensed, or in a license itself, both of which shall be considered to be privileges granted to the applicant in the sole discretion of the Tribal Gaming Agency.

Sec. 6.5.1. Denial, Suspension, or Revocation of Licenses. (a) Any application for a gaming license may be denied, and any license issued may be revoked, if the Tribal Gaming Agency determines that the application is incomplete or deficient, or if the applicant is determined to be unsuitable or otherwise unqualified for a gaming license. Pending consideration of revocation, the Tribal Gaming Agency may suspend a license in accordance with Section 6.5.5. All rights to notice and hearing shall be governed by tribal law, as to which the applicant will be notified in writing along with notice of an intent to suspend or revoke the license.

(b) (i) Except as provided in paragraph (ii) below, upon receipt of notice that the State Gaming Agency has determined that a person would be unsuitable for licensure in a gambling establishment subject to the jurisdiction of the State Gaming Agency, the Tribal Gaming Agency shall promptly revoke any license that has theretofore been

issued to the person; provided that the Tribal Gaming Agency may, in its discretion, re-issue a license to the person following entry of a final judgment reversing the determination of the State Gaming Agency in a proceeding in state court conducted pursuant to section 1085 of the California Civil Code.

(ii) Notwithstanding a determination of unsuitability by the State Gaming Agency, the Tribal Gaming Agency may, in its discretion, decline to revoke a tribal license issued to a person employed by the Tribe pursuant to Section 6.4.4(c) or Section 6.4.4(d).

Sec. 6.5.2. Renewal of Licenses; Extensions; Further Investigation. The term of a tribal gaming license shall not exceed two years, and application for renewal of a license must be made prior to its expiration. Applicants for renewal of a license shall provide updated material as requested, on the appropriate renewal forms, but, at the discretion of the Tribal Gaming Agency, may not be required to resubmit historical data previously submitted or that is otherwise available to the Tribal Gaming Agency. At the discretion of the Tribal Gaming Agency, an additional background investigation may be required at any time if the Tribal Gaming Agency determines the need for further information concerning the applicant's continuing suitability or eligibility for a license. Prior to renewing a license, the Tribal Gaming Agency shall deliver to the State Gaming Agency copies of all information and documents received in connection with the application for renewal.

Sec. 6.5.3. Identification Cards. The Tribal Gaming Agency shall require that all persons who are required to be licensed wear, in plain view at all times while in the Gaming Facility, identification badges issued by the Tribal Gaming Agency. Identification badges must display information including, but not limited to, a photograph and an identification number that is adequate to enable agents of the Tribal Gaming Agency to readily identify the person and determine the validity and date of expiration of his or her license.

Sec. 6.5.4. Fees for Tribal License. The fees for all tribal licenses shall be set by the Tribal Gaming Agency.

Sec. 6.5.5. Suspension of Tribal License. The Tribal Gaming Agency may summarily suspend the license of any employee if the Tribal Gaming Agency determines that the continued licensing of the person or entity could constitute a threat to the public health or safety or may violate the Tribal Gaming Agency's licensing or other standards. Any right to notice or hearing in regard thereto shall be governed by Tribal law.



Sec. 6.5.6. State Certification Process. (a) Upon receipt of a completed license application and a determination by the Tribal Gaming Agency that it intends to issue the earlier of a temporary or permanent license, the Tribal Gaming Agency shall transmit to the State Gaming Agency a notice of intent to license the applicant, together with all of the following: (i) a copy of all tribal license application materials and information received by the Tribal Gaming Agency from the applicant; (ii) an original set of fingerprint cards; (iii) a current photograph; and (iv) except to the extent waived by the State Gaming Agency, such releases of information, waivers, and other completed and executed forms as have been obtained by the Tribal Gaming Agency. Except for an applicant for licensing as a non-key Gaming Employee, as defined by agreement between the Tribal Gaming Agency and the State Gaming Agency, the Tribal Gaming Agency shall require the applicant also to file an application with the State Gaming Agency, prior to issuance of a temporary or permanent tribal gaming license, for a determination of suitability for licensure under the California Gambling Control Act. Investigation and disposition of that application shall be governed entirely by state law, and the State Gaming Agency shall determine whether the applicant would be found suitable for licensure in a gambling establishment subject to that Agency's jurisdiction. Additional information may be required by the State Gaming Agency to assist it in its background investigation, provided that such State Gaming Agency requirement shall be no greater than that which may be required of applicants for a State gaming license in connection withnontribal gaming activities and at a similar level of participation or employment. A determination of suitability is valid for the term of the tribal license held by the applicant, and the Tribal Gaming Agency shall require a licensee to apply for renewal of a determination of suitability at such time as the licensee applies for renewal of a tribal gaming license. The State Gaming Agency and the Tribal Gaming Agency (together with tribal gaming agencies under other gaming compacts) shall cooperate in developing standard licensing forms for tribal gaming license applicants, on a statewide basis, that reduce or eliminate duplicative or excessive paperwork, which forms and procedures shall take into account the Tribe's requirements under IGRA and the expense thereof.

(b) Background Investigations of Applicants. Upon receipt of completed license application information from the Tribal Gaming Agency, the State Gaming Agency may conduct a background investigation pursuant to state law to determine whether the applicant would be suitable to be licensed for association with a gambling establishment subject to the jurisdiction of the State Gaming Agency. If further investigation is required to supplement the investigation conducted by the Tribal

05/04/2004 07:45 FAX 702407    HARRAH'S ENTERTAINMEN    ☒ 025



Gaming Agency, the applicant will be required to pay the statutory application fee charged by the State Gaming Agency pursuant to California Business and Professions Code section 19941(a), but any deposit requested by the State Gaming Agency pursuant to section 19855 of that Code shall take into account reports of the background investigation already conducted by the Tribal Gaming Agency and the NIGC, if any. Failure to pay the application fee or deposit may be grounds for denial of the application by the State Gaming Agency. The State Gaming Agency and Tribal Gaming Agency shall cooperate in sharing as much background information as possible, both to maximize investigative efficiency and thoroughness, and to minimize investigative costs. Upon completion of the necessary background investigation or other verification of suitability, the State Gaming Agency shall issue a notice to the Tribal Gaming Agency certifying that the State has determined that the applicant would be suitable, or that the applicant would be unsuitable, for licensure in a gambling establishment subject to the jurisdiction of the State Gaming Agency and, if unsuitable, stating the reasons therefor.

(c) The Tribe shall monthly provide the State Gaming Agency with the name, badge identification number, and job descriptions of all non-key Gaming Employees.

(d) Prior to denying an application for a determination of suitability, the State Gaming Agency shall notify the Tribal Gaming Agency and afford the Tribe an opportunity to be heard. If the State Gaming Agency denies an application for a determination of suitability, that Agency shall provide the applicant with written notice of all appeal rights available under state law.

Sec. 7.0. COMPLIANCE ENFORCEMENT.

Sec. 7.1. On-Site Regulation. It is the responsibility of the Tribal Gaming Agency to conduct on-site gaming regulation and control in order to enforce the terms of this Gaming Compact, IGRA, and the Tribal Gaming Ordinance with respect to Gaming Operation and Facility compliance, and to protect the integrity of the Gaming Activities, the reputation of the Tribe and the Gaming Operation for honesty and fairness, and the confidence of patrons that tribal government gaming in California meets the highest standards of regulation and internal controls. To meet those responsibilities, the Tribal Gaming Agency shall adopt and enforce regulations, procedures, and practices as set forth herein.

Sec. 7.2. Investigation and Sanctions. The Tribal Gaming Agency shall investigate any reported violation of this Gaming Compact and shall require the Gaming Operation to correct the violation upon such terms and conditions as the Tribal Gaming Agency determines are necessary. The Tribal Gaming Agency shall be

05/04/2004 07:46 FAX 7024076    HARRAH'S ENTERTAINMENT    ☒026



empowered by the Tribal Gaming Ordinance to impose fines or other sanctions within the jurisdiction of the Tribe against gaming licensees or other persons who interfere with or violate the Tribe's gaming regulatory requirements and obligations under IGRA, the Tribal Gaming Ordinance, or this Gaming Compact. The Tribal Gaming Agency shall report significant or continued violations of this Compact or failures to comply with its orders to the State Gaming Agency.

Sec. 7.3. Assistance by State Gaming Agency. The Tribe may request the assistance of the State Gaming Agency whenever it reasonably appears that such assistance may be necessary to carry out the purposes described in Section 7.1, or otherwise to protect public health, safety, or welfare. If requested by the Tribe or Tribal Gaming Agency, the State Gaming Agency shall provide requested services to ensure proper compliance with this Gaming Compact. The State shall be reimbursed for its actual and reasonable costs of that assistance, if the assistance required expenditure of extraordinary costs.

Sec. 7.4. Access to Premises by State Gaming Agency; Notification Inspections. Notwithstanding that the Tribe has the primary responsibility to administer and enforce the regulatory requirements of this Compact, the State Gaming Agency shall have the right to inspect the Tribe's Gaming Facility with respect to Class III Gaming Activities only, and all Gaming Operation or Facility records relating thereto, subject to the following conditions:

Sec. 7.4.1. Inspection of public areas of a Gaming Facility may be made at any time without prior notice during normal Gaming Facility business hours.

Sec. 7.4.2. Inspection of areas of a Gaming Facility not normally accessible to the public may be made at any time during normal Gaming Facility business hours, immediately after the State Gaming Agency's authorized inspector notifies the Tribal Gaming Agency of his or her presence on the premises, presents proper identification, and requests access to the non-public areas of the Gaming Facility. The Tribal Gaming Agency, in its sole discretion, may require a member of the Tribal Gaming Agency to accompany the State Gaming Agency inspector at all times that the State Gaming Agency inspector is in a non-public area of the Gaming Facility. If the Tribal Gaming Agency imposes such a requirement, it shall require such member to be available at all times for those purposes and shall ensure that the member has the ability to gain immediate access to all non-public areas of the Gaming Facility. Nothing in this Compact shall be construed to limit the State Gaming Agency to one inspector during inspections.

Sec. 7.4.3. (a) Inspection and copying of Gaming Operation papers, books, and records may occur at any time, immediately after notice to the Tribal Gaming Agency, during the normal hours of the Gaming Facility's business office, provided that the inspection and copying of those papers, books or records shall not interfere with the normal functioning of the Gaming Operation or Facility. Notwithstanding any other provision of California law, all information and records that the State Gaming Agency obtains, inspects, or copies pursuant to this Gaming Compact shall be, and remain, the property solely of the Tribe; provided that such records and copies may be retained by the State Gaming Agency as reasonably necessary for completion of any investigation of the Tribe's compliance with this Compact.

(b)(i) The State Gaming Agency will exercise utmost care in the preservation of the confidentiality of any and all information and documents received from the Tribe, and will apply the highest standards of confidentiality expected under state law to preserve such information and documents from disclosure. The Tribe may avail itself of any and all remedies under state law for improper disclosure of information or documents. To the extent reasonably feasible, the State Gaming Agency will consult with representatives of the Tribe prior to disclosure of any documents received from the Tribe, or any documents compiled from such documents or from information received from the Tribe, including any disclosure compelled by judicial process, and, in the case of any disclosure compelled by judicial process, will endeavor to give the Tribe immediate notice of the order compelling disclosure and a reasonable opportunity to interpose an objection thereto with the court.

(ii) The Tribal Gaming Agency and the State Gaming Agency shall confer and agree upon protocols for release to other law enforcement agencies of information obtained during the course of background investigations.

(c) Records received by the State Gaming Agency from the Tribe in compliance with this Compact, or information compiled by the State Gaming Agency from those records, shall be exempt from disclosure under the California Public Records Act.

Sec. 7.4.4. Notwithstanding any other provision of this Compact, the State Gaming Agency shall not be denied access to papers, books, records, equipment, or places where such access is reasonably necessary to ensure compliance with this Compact.

Sec. 7.4.5. (a) Subject to the provisions of subdivision (b), the Tribal Gaming Agency shall not permit any Gaming Device to be transported to or from the Tribe's land except in accordance with procedures established by agreement between the State Gaming Agency and the Tribal Gaming Agency and upon at least 10 days' notice to the Sheriff's Department for the county in which the land is located.

23

05/04/2004 07:47 FAX 7024076285   HARRAH'S ENTERTAINMENT   ☒028

(b) Transportation of a Gaming Device from the Gaming Facility within California is permissible only if: (i) The final destination of the device is a gaming facility of any tribe in California that has a compact with the State; (ii) The final destination of the device is any other state in which possession of the device or devices is made lawful by state law or by tribal-state compact; (iii) The final destination of the device is another country, or any state or province of another country, wherein possession of the device is lawful; or (iv) The final destination is a location within California for testing, repair, maintenance, or storage by a person or entity that has been licensed by the Tribal Gaming Agency and has been found suitable for licensure by the State Gaming Agency.

(c) Gaming Devices transported off the Tribe's land in violation of this Section 7.4.5 or in violation of any permit issued pursuant thereto is subject to summary seizure by California peace officers.

Sec. 8.0. RULES AND REGULATIONS FOR THE OPERATION AND MANAGEMENT OF THE TRIBAL GAMING OPERATION.

Sec. 8.1. Adoption of Regulations for Operation and Management; Minimum Standards. In order to meet the goals set forth in this Gaming Compact and required of the Tribe by law, the Tribal Gaming Agency shall be vested with the authority to promulgate, and shall promulgate, at a minimum, rules and regulations or specifications governing the following subjects, and to ensure their enforcement in an effective manner:

Sec. 8.1.1. The enforcement of all relevant laws and rules with respect to the Gaming Operation and Facility, and the power to conduct investigations and hearings with respect thereto, and to any other subject within its jurisdiction.

Sec. 8.1.2. Ensuring the physical safety of Gaming Operation patrons and employees, and any other person while in the Gaming Facility. Nothing herein shall be construed to make applicable to the Tribe any state laws, regulations, or standards governing the use of tobacco.

Sec. 8.1.3. The physical safeguarding of assets transported to, within, and from the Gaming Facility.

Sec. 8.1.4. The prevention of illegal activity from occurring within the Gaming Facility or with regard to the Gaming Operation, including, but not limited to, the maintenance of employee procedures and a surveillance system as provided below.

Sec. 8.1.5. The recording of any and all occurrences within the Gaming Facility that deviate from normal operating policies and procedures (hereafter "incidents"). The procedure for recording incidents shall: (1) specify that security personnel record

all incidents, regardless of an employee's determination that the incident may be immaterial (all incidents shall be identified in writing); (2) require the assignment of a sequential number to each report; (3) provide for permanent reporting in indelible ink in a bound notebook from which pages cannot be removed and in which entries are made on each side of each page; and (4) require that each report include, at a minimum, all of the following:

    (a) The record number.

    (b) The date.

    (c) The time.

    (d) The location of the incident.

    (e) A detailed description of the incident.

    (f) The persons involved in the incident.

    (g) The security department employee assigned to the incident.

Sec. 8.1.6. The establishment of employee procedures designed to permit detection of any irregularities, theft, cheating, fraud, or the like, consistent with industry practice.

Sec. 8.1.7. Maintenance of a list of persons barred from the Gaming Facility who, because of their past behavior, criminal history, or association with persons or organizations, pose a threat to the integrity of the Gaming Activities of the Tribe or to the integrity of regulated gaming within the State.

Sec. 8.1.8. The conduct of an audit of the Gaming Operation, not less than annually, by an independent certified public accountant, in accordance with the auditing and accounting standards for audits of casinos of the American Institute of Certified Public Accountants.

Sec. 8.1.9. Submission to, and prior approval, from the Tribal Gaming Agency of the rules and regulations of each Class III game to be operated by the Tribe, and of any changes in those rules and regulations. No Class III game may be played that has not received Tribal Gaming Agency approval.

Sec. 8.1.10. Addressing all of the following:

(a) Maintenance of a copy of the rules, regulations, and procedures for each game as played, including, but not limited to, the method of play and the odds and method of determining amounts paid to winners;

(b) Specifications and standards to ensure that information regarding the method of play, odds, and payoff determinations shall be visibly displayed or available to patrons in written form in the Gaming Facility;



(c) Specifications ensuring that betting limits applicable to any gaming station shall be displayed at that gaming station;

(d) Procedures ensuring that in the event of a patron dispute over the application of any gaming rule or regulation, the matter shall be handled in accordance with, industry practice and principles of fairness, pursuant to the Tribal Gaming Ordinance and any rules and regulations promulgated by the Tribal Gaming Agency.

Sec. 8.1.11. Maintenance of a closed-circuit television surveillance system consistent with industry standards for gaming facilities of the type and scale operated by the Tribe, which system shall be approved by, and may not be modified without the approval of, the Tribal Gaming Agency. The Tribal Gaming Agency shall have current copies of the Gaming Facility floor plan and closed-circuit television system at all times, and any modifications thereof first shall be approved by the Tribal Gaming Agency.

Sec. 8.1.12. Maintenance of a cashier's cage in accordance with industry standards for such facilities.

Sec. 8.1.13. Specification of minimum staff and supervisory requirements for each Gaming Activity to be conducted.

Sec. 8.1.14. Technical standards and specifications for the operation of Gaming Devices and other games authorized herein to be conducted by the Tribe, which technical specifications may be no less stringent than those approved by a recognized gaming testing laboratory in the gaming industry.

Sec. 8.2. State Civil and Criminal Jurisdiction. Nothing in this Gaming Compact affects the civil or criminal jurisdiction of the State under Public Law 280 (18 U.S.C. Sec. 1162; 28 U.S.C. Sec. 1360) or IGRA, to the extent applicable. In addition, criminal jurisdiction to enforce state gambling laws is transferred to the State pursuant to 18 U.S.C. § 1166(d), provided that no Gaming Activity conducted by the Tribe pursuant to this Gaming Compact may be deemed to be a civil or criminal violation of any law of the State.

Sec. 8.3. (a) The Tribe shall take all reasonable steps to ensure that members of the Tribal Gaming Agency are free from corruption, undue influence, compromise, and conflicting interests in the conduct of their duties under this Compact; shall adopt a conflict-of-interest code to that end; and shall ensure the prompt removal of any member of the Tribal Gaming Agency who is found to have acted in a corrupt or compromised manner.

(b) The Tribe shall conduct a background investigation on a prospective member of the Tribal Gaming Agency, who shall meet the background requirements of a

05/04/2004 07:48 FAX 7024076    HARRAH'S ENTERTAINMENT    @ 031



management contractor under IGRA; provided that, if such official is elected through a tribal election process, that official may not participate in any Tribal Gaming Agency matters under this Compact unless a background investigation has been concluded and the official has been found to be suitable. If requested by the tribal government or the Tribal Gaming Agency, the State Gaming Agency may assist in the conduct of such a background investigation and may assist in the investigation of any possible corruption or compromise of a member of the agency.

Sec. 8.4. In order to foster statewide uniformity of regulation of Class III gaming operations throughout the state, rules, regulations, standards, specifications, and procedures of the Tribal Gaming Agency in respect to any matter encompassed by Sections 6.0, 7.0, or 8.0 shall be consistent with regulations adopted by the State Gaming Agency in accordance with Section 8.4.1. Chapter 3.5 (commencing with section 11340) of Part 1 of Division 3 of Title 2 of the California Government Code does not apply to regulations adopted by the State Gaming Agency in respect to tribal gaming operations under this Section.

Sec. 8.4.1. (a) Except as provided in subdivision (d), no State Gaming Agency regulation shall be effective with respect to the Tribe's Gaming Operation unless it has first been approved by the Association and the Tribe has had an opportunity to review and comment on the proposed regulation.

(b) Every State Gaming Agency regulation that is intended to apply to the Tribe (other than a regulation proposed or previously approved by the Association) shall be submitted to the Association for consideration prior to submission of the regulation to the Tribe for comment as provided in subdivision (c). A regulation that is disapproved by the Association shall not be submitted to the Tribe for comment unless it is re-adopted by the State Gaming Agency as a proposed regulation, in its original or amended form, with a detailed, written response to the Association's objections.

(c) Except as provided in subdivision (d), no regulation of the State Gaming Agency shall be adopted as a final regulation in respect to the Tribe's Gaming Operation before the expiration of 30 days after submission of the proposed regulation to the Tribe for comment as a proposed regulation, and after consideration of the Tribe's comments, if any.

(d) In exigent circumstances (e.g., imminent threat to public health and safety), the State Gaming Agency may adopt a regulation that becomes effective immediately. Any such regulation shall be accompanied by a detailed, written description of the exigent circumstances, and shall be submitted immediately to the Association for consideration. If the regulation is disapproved by the Association, it shall cease to be

05/04/2004 07:49 FAX 7024076    HARRAH'S ENTERTAINMENT    ☑032



effective, but may be re-adopted by the State Gaming Agency as a proposed regulation, in its original or amended form, with a detailed, written response to the Association's objections, and thereafter submitted to the Tribe for comment as provided in subdivision (c).

(e) The Tribe may object to a State Gaming Agency regulation on the ground that it is unnecessary, unduly burdensome, or unfairly discriminatory, and may seek repeal or amendment of the regulation through the dispute resolution process of Section 9.0.

Sec. 9.0. DISPUTE RESOLUTION PROVISIONS.

Sec. 9.1. Voluntary Resolution; Reference to Other Means of Resolution. In recognition of the government-to-government relationship of the Tribe and the State, the parties shall make their best efforts to resolve disputes that occur under this Gaming Compact by good faith negotiations whenever possible. Therefore, without prejudice to the right of either party to seek injunctive relief against the other when circumstances are deemed to require immediate relief, the parties hereby establish a threshold requirement that disputes between the Tribe and the State first be subjected to a process of meeting and conferring in good faith in order to foster a spirit of cooperation and efficiency in the administration and monitoring of performance and compliance by each other with the terms, provisions, and conditions of this Gaming Compact, as follows:

(a) Either party shall give the other, as soon as possible after the event giving rise to the concern, a written notice setting forth, with specificity, the issues to be resolved.

(b) The parties shall meet and confer in a good faith attempt to resolve the dispute through negotiation not later than 10 days after receipt of the notice, unless both parties agree in writing to an extension of time.

(c) If the dispute is not resolved to the satisfaction of the parties within 30 calendar days after the first meeting, then either party may seek to have the dispute resolved by an arbitrator in accordance with this section, but neither party shall be required to agree to submit to arbitration.

(d) Disagreements that are not otherwise resolved by arbitration or other mutually acceptable means as provided in Section 9.3 may be resolved in the United States District Court where the Tribe's Gaming Facility is located, or is to be located, and the Ninth Circuit Court of Appeals (or, if those federal courts lack jurisdiction, in any state court of competent jurisdiction and its related courts of appeal). The disputes to be submitted to court action include, but are not limited to, claims of breach or violation of this Compact, or failure to negotiate in good faith as required by the terms of this Compact. In no event may the Tribe be precluded from pursuing any arbitration or

judicial remedy against the State on the grounds that the Tribe has failed to exhaust its state administrative remedies. The parties agree that, except in the case of imminent threat to the public health or safety, reasonable efforts will be made to explore alternative dispute resolution avenues prior to resort to judicial process.

Sec. 9.2. Arbitration Rules. Arbitration shall be conducted in accordance with the policies and procedures of the Commercial Arbitration Rules of the American Arbitration Association, and shall be held on the Tribe's land or, if unreasonably inconvenient under the circumstances, at such other location as the parties may agree. Each side shall bear its own costs, attorneys' fees, and one-half the costs and expenses of the American Arbitration Association and the arbitrator, unless the arbitrator rules otherwise. Only one neutral arbitrator may be named, unless the Tribe or the State objects, in which case a panel of three arbitrators (one of whom is selected by each party) will be named. The provisions of Section 1283.05 of the California Code of Civil Procedure shall apply; provided that no discovery authorized by that section may be conducted without leave of the arbitrator. The decision of the arbitrator shall be in writing, give reasons for the decision, and shall be binding. Judgment on the award may be entered in any federal or state court having jurisdiction thereof.

Sec. 9.3. No Waiver or Preclusion of Other Means of Dispute Resolution. This Section 9.0 may not be construed to waive, limit, or restrict any remedy that is otherwise available to either party, nor may this Section be construed to preclude, limit, or restrict the ability of the parties to pursue, by mutual agreement, any other method of dispute resolution, including, but not limited to, mediation or utilization of a technical advisor to the Tribal and State Gaming Agencies; provided that neither party is under any obligation to agree to such alternative method of dispute resolution.

Sec. 9.4. Limited Waiver of Sovereign Immunity. (a) In the event that a dispute is to be resolved in federal court or a state court of competent jurisdiction as provided in this Section 9.0, the State and the Tribe expressly consent to be sued therein and waive any immunity therefrom that they may have provided that:

(1) The dispute is limited solely to issues arising under this Gaming Compact;

(2) Neither side makes any claim for monetary damages (that is, only injunctive, specific performance, including enforcement of a provision of this Compact requiring payment of money to one or another of the parties, or declaratory relief is sought); and

(3) No person or entity other than the Tribe and the State is party to the action, unless failure to join a third party would deprive the court of jurisdiction; provided that nothing herein shall be construed to constitute a waiver of the sovereign immunity of either the Tribe or the State in respect to any such third party.

05/04/2004 07:50 FAX 7024076281     HARRAH'S ENTERTAINMENT     ☒034

(b) In the event of intervention by any additional party into any such action without the consent of the Tribe and the State, the waivers of either the Tribe or the State provided for herein may be revoked, unless joinder is required to preserve the court's jurisdiction; provided that nothing herein shall be construed to constitute a waiver of the sovereign immunity of either the Tribe or the State in respect to any such third party.

(c) The waivers and consents provided for under this Section 9.0 shall extend to civil actions authorized by this Compact, including, but not limited to, actions to compel arbitration, any arbitration proceeding herein, any action to confirm or enforce any judgment or arbitration award as provided herein, and any appellate proceedings emanating from a matter in which an immunity waiver has been granted. Except as stated herein or elsewhere in this Compact, no other waivers or consents to be sued, either express or implied, are granted by either party.

Sec. 10.0. PUBLIC AND WORKPLACE HEALTH, SAFETY, AND LIABILITY.

Sec. 10.1. The Tribe will not conduct Class III gaming in a manner that endangers the public health, safety, or welfare; provided that nothing herein shall be construed to make applicable to the Tribe any state laws or regulations governing the use of tobacco.

Sec. 10.2. Compliance. For the purposes of this Gaming Compact, the Tribal Gaming Operation shall:

(a) Adopt and comply with standards no less stringent than state public health standards for food and beverage handling. The Gaming Operation will allow inspection of food and beverage services by state or county health inspectors, during normal hours of operation, to assess compliance with these standards, unless inspections are routinely made by an agency of the United States government to ensure compliance with equivalent standards of the United States Public Health Service. Nothing herein shall be construed as submission of the Tribe to the jurisdiction of those state or county health inspectors, but any alleged violations of the standards shall be treated as alleged violations of this Compact.

(b) Adopt and comply with standards no less stringent than federal water quality and safe drinking water standards applicable in California; the Gaming Operation will allow for inspection and testing of water quality by state or county health inspectors, as applicable, during normal hours of operation, to assess compliance with these standards, unless inspections and testing are made by an agency of the United States pursuant to, or by the Tribe under express authorization of, federal law, to ensure compliance with federal water quality and safe drinking water standards. Nothing

herein shall be construed as submission of the Tribe to the jurisdiction of those state or county health inspectors, but any alleged violations of the standards shall be treated as alleged violations of this Compact.

(c) Comply with the building and safety standards set forth in Section 6.4.

(d) Carry no less than five million dollars ($5,000,000) in public liability insurance for patron claims, and that the Tribe provide reasonable assurance that those claims will be promptly and fairly adjudicated, and that legitimate claims will be paid; provided that nothing herein requires the Tribe to agree to liability for punitive damages or attorneys' fees. On or before the effective date of this Compact or not less than 30 days prior to the commencement of Gaming Activities under this Compact, whichever is later, the Tribe shall adopt and make available to patrons a tort liability ordinance setting forth the terms and conditions, if any, under which the Tribe waives immunity to suit for money damages resulting from intentional or negligent injuries to person or property at the Gaming Facility or in connection with the Tribe's Gaming Operation, including procedures for processing any claims for such money damages; provided that nothing in this Section shall require the Tribe to waive its immunity to suit except to the extent of the policy limits set out above.

(e) Adopt and comply with standards no less stringent than federal workplace and occupational health and safety standards; the Gaming Operation will allow for inspection of Gaming Facility workplaces by state inspectors, during normal hours of operation, to assess compliance with these standards, unless inspections are regularly made by an agency of the United States government to ensure compliance with federal workplace and occupational health and safety standards.  Nothing herein shall be construed as submission of the Tribe to the jurisdiction of those state inspectors, but any alleged violations of the standards shall be treated as alleged violations of this Compact.

(f) Comply with tribal codes and other applicable federal law regarding public health and safety.

(g) Adopt and comply with standards no less stringent than federal laws and state laws forbidding employers generally from discriminating in the employment of persons to work for the Gaming Operation or in the Gaming Facility on the basis of race, color, religion, national origin, gender, sexual orientation, age, or disability; provided that nothing herein shall preclude the tribe from giving a preference in employment to Indians, pursuant to a duly adopted tribal ordinance.

(h) Adopt and comply with standards that are no less stringent than state laws prohibiting a gaming enterprise from cashing any check drawn against a federal, state,

05/04/2004 07:51 FAX 7024076285        HARRAH'S ENTERTAINMENT                ☑036



county, or city fund, including but not limited to, Social Security, unemployment insurance, disability payments, or public assistance payments.

(i) Adopt and comply with standards that are no less stringent than state laws, if any, prohibiting a gaming enterprise from providing, allowing, contracting to provide, or arranging to provide alcoholic beverages, or food or lodging for no charge or at reduced prices at a gambling establishment or lodging facility as an incentive or enticement.

(j) Adopt and comply with standards that are no less stringent than state laws, if any, prohibiting extensions of credit.

(k) Provisions of the Bank Secrecy Act, P.L. 91-508, October 26, 1970, 31 U.S.C. Sec. 5311-5314, as amended, and all reporting requirements of the Internal Revenue Service, insofar as such provisions and reporting requirements are applicable to casinos.

Sec. 10.2.1.  The Tribe shall adopt and, not later than 30 days after the effective date of this Compact, shall make available on request the standards described in subdivisions (a)-(c) and (e)-(k) of Section 10.2 to which the Gaming Operation is held. In the absence of a promulgated tribal standard in respect to a matter identified in those subdivisions, or the express adoption of an applicable federal statute or regulation in lieu of a tribal standard in respect to any such matter, the applicable state statute or regulation shall be deemed to have been adopted by the Tribe as the applicable standard.

Sec. 10.3 Participation in state statutory programs related to employment. (a) In lieu of permitting the Gaming Operation to participate in the state statutory workers' compensation system, the Tribe may create and maintain a system that provides redress for employee work-related injuries through requiring insurance or self-insurance, which system must include a scope of coverage, availability of an independent medical examination, right to notice, hearings before an independent tribunal, a means of enforcement against the employer, and benefits comparable to those mandated for comparable employees under state law.   Not later than the effective date of this Compact, or 60 days prior to the commencement of Gaming Activities under this Compact, the Tribe will advise the State of its election to participate in the statutory workers' compensation system or, alternatively, will forward to the State all relevant ordinances that have been adopted and all other documents establishing the system and demonstrating that the system is fully operational and compliant with the comparability standard set forth above. The parties

05/04/2004 07:51 FAX 702407    HARRAH'S ENTERTAINMENT    ☑037



agree that independent contractors doing business with the Tribe must comply with all state workers' compensation laws and obligations.

(b) The Tribe agrees that its Gaming Operation will participate in the State's program for providing unemployment compensation benefits and unemployment compensation disability benefits with respect to employees employed at the Gaming Facility, including compliance with the provisions of the California Unemployment Insurance Code, and the Tribe consents to the jurisdiction of the state agencies charged with the enforcement of that Code and of the courts of the State of California for purposes of enforcement.

(c) As a matter of comity, with respect to persons employed at the Gaming Facility, other than members of the Tribe, the Tribal Gaming Operation shall withhold all taxes due to the State as provided in the California Unemployment Insurance Code and the Revenue and Taxation Code, and shall forward such amounts as provided in said Codes to the State.

Sec. 10.4. Emergency Service Accessibility. The Tribe shall make reasonable provisions for adequate emergency fire, medical, and related relief and disaster services for patrons and employees of the Gaming Facility.

Sec. 10.5. Alcoholic Beverage Service. Standards for alcohol service shall be subject to applicable law.

Sec. 10.6. Possession of firearms shall be prohibited at all times in the Gaming Facility except for state, local, or tribal security or law enforcement personnel authorized by tribal law and by federal or state law to possess fire arms at the Facility.

Sec. 10.7. Labor Relations.

Notwithstanding any other provision of this Compact, this Compact shall be null and void if, on or before October 13, 1999, the Tribe has not provided an agreement or other procedure acceptable to the State for addressing organizational and representational rights of Class III Gaming Employees and other employees associated with the Tribe's Class III gaming enterprise, such as food and beverage, housekeeping, cleaning, bell and door services, and laundry employees at the Gaming Facility or any related facility, the only significant purpose of which is to facilitate patronage at the Gaming Facility.

Sec. 10.8. Off-Reservation Environmental Impacts.

Sec. 10.8.1. On or before the effective date of this Compact, or not less than 90 days prior to the commencement of a Project, as defined herein, the Tribe shall adopt an ordinance providing for the preparation, circulation, and consideration by the Tribe of environmental impact reports concerning potential off-Reservation environmental

impacts of any and all Projects to be commenced on or after the effective date of this Compact. In fashioning the environmental protection ordinance, the Tribe will make a good faith effort to incorporate the policies and purposes of the National Environmental Policy Act and the California Environmental Quality Act consistent with the Tribe's governmental interests.

Sec. 10.8.2. (a) Prior to commencement of a Project, the Tribe will:

(1) Inform the public of the planned Project;

(2) Take appropriate actions to determine whether the project will have any significant adverse impacts on the off-Reservation environment;

(3) For the purpose of receiving and responding to comments, submit all environmental impact reports concerning the proposed Project to the State Clearinghouse in the Office of Planning and Research and the county board of supervisors, for distribution to the public.

(4) Consult with the board of supervisors of the county or counties within which the Tribe's Gaming Facility is located, or is to be located, and, if the Gaming Facility is within a city, with the city council, and if requested by the board or council, as the case may be, meet with them to discuss mitigation of significant adverse off-Reservation environmental impacts;

(5) Meet with and provide an opportunity for comment by those members of the public residing off-Reservation within the vicinity of the Gaming Facility such as might be adversely affected by proposed Project.

(b) During the conduct of a Project, the Tribe shall:

(1) Keep the board or council, as the case may be, and potentially affected members of the public apprized of the project's progress; and

(2) Make good faith efforts to mitigate any and all such significant adverse off-Reservation environmental impacts.

(c) As used in Section 10.8.1 and this Section 10.8.2, the term "Project" means any expansion or any significant renovation or modification of an existing Gaming Facility, or any significant excavation, construction, or development associated with the Tribe's Gaming Facility or proposed Gaming Facility and the term "environmental impact reports" means any environmental assessment, environmental impact report, or environmental impact statement, as the case may be.

Sec. 10.8.3. (a) The Tribe and the State shall, from time to time, meet to review the adequacy of this Section 10.8, the Tribe's ordinance adopted pursuant thereto, and the Tribe's compliance with its obligations under Section 10.8.2, to ensure that

significant adverse impacts to the off-Reservation environment resulting from projects undertaken by the Tribe may be avoided or mitigated.

(b) At any time after January 1, 2003, but not later than March 1, 2003, the State may request negotiations for an amendment to this Section 10.8 on the ground that, as it presently reads, the Section has proven to be inadequate to protect the off-Reservation environment from significant adverse impacts resulting from Projects undertaken by the Tribe or to ensure adequate mitigation by the Tribe of significant adverse off-Reservation environmental impacts and, upon such a request, the Tribe will enter into such negotiations in good faith.

(c) On or after January 1, 2004, the Tribe may bring an action in federal court under 25 U.S.C. Sec. 2710(d)(7)(A)(i) on the ground that the State has failed to negotiate in good faith, provided that the Tribe's good faith in the negotiations shall also be in issue. In any such action, the court may consider whether the State's invocation of its rights under subdivision (b) of this Section 10.8.3 was in good faith. If the State has requested negotiations pursuant to subdivision (b) but, as of January 1, 2005, there is neither an agreement nor an order against the State under 25 U.S.C. Sec. 2710(d)(7)(B)(iii), then, on that date, the Tribe shall immediately cease construction and other activities on all projects then in progress that have the potential to cause adverse off-Reservation impacts, unless and until an agreement to amend this Section 10.8 has been concluded between the Tribe and the State.

Sec. 11.0. EFFECTIVE DATE AND TERM OF COMPACT.

Sec. 11.1. Effective Date. This Gaming Compact shall not be effective unless and until all of the following have occurred:

(a) The Compact is ratified by statute in accordance with state law;

(b) Notice of approval or constructive approval is published in the Federal Register as provided in 25 U.S.C. 2710(d)(3)(B); and

(c) SCA 11 is approved by the California voters in the March 2000 general election.

Sec. 11.2. Term of Compact; Termination.

Sec. 11.2.1. Effective. (a) Once effective this Compact shall be in full force and effect for state law purposes until December 31, 2020.

(b) Once ratified, this Compact shall constitute a binding and determinative agreement between the Tribe and the State, without regard to voter approval of any constitutional amendment, other than SCA 11, that authorizes a gaming compact.

(c) Either party may bring an action in federal court, after providing a sixty (60) day written notice of an opportunity to cure any alleged breach of this Compact, for

05/04/2004 07:53 FAX 7024076285          HARRAH'S ENTERTAINMENT                              ☑040

a declaration that the other party has materially breached this Compact. Upon issuance of such a declaration, the complaining party may unilaterally terminate this Compact upon service of written notice on the other party. In the event a federal court determines that it lacks jurisdiction over such an action, the action may be brought in the superior court for the county in which the Tribe's Gaming Facility is located. The parties expressly waive their immunity to suit for purposes of an action under this subdivision, subject to the qualifications stated in Section 9.4(a).

Sec. 12.0. AMENDMENTS; RENEGOTIATIONS.

Sec. 12.1. The terms and conditions of this Gaming Compact may be amended at any time by the mutual and written agreement of both parties.

Sec. 12.2. This Gaming Compact is subject to renegotiation in the event the Tribe wishes to engage in forms of Class III gaming other than those games authorized herein and requests renegotiation for that purpose, provided that no such renegotiation may be sought for 12 months following the effective date of this Gaming Compact.

Sec. 12.3. Process and Negotiation Standards. All requests to amend or renegotiate this Gaming Compact shall be in writing, addressed to the Tribal Chairperson or the Governor, as the case may be, and shall include the activities or circumstances to be negotiated, together with a statement of the basis supporting the request. If the request meets the requirements of this Section, the parties shall confer promptly and determine a schedule for commencing negotiations within 30 days of the request. Unless expressly provided otherwise herein, all matters involving negotiations or other amendatory processes under Section 4.3.3(b) and this Section 12.0 shall be governed, controlled, and conducted in conformity with the provisions and requirements of IGRA, including those provisions regarding the obligation of the State to negotiate in good faith and the enforcement of that obligation in federal court. The Chairperson of the Tribe and the Governor of the State are hereby authorized to designate the person or agency responsible for conducting the negotiations, and shall execute any documents necessary to do so.

Sec. 12.4. The Tribe shall have the right to terminate this Compact in the event the exclusive right of Indian tribes to operate Gaming Devices in California is abrogated by the enactment, amendment, or repeal of a state statute or constitutional provision, or the conclusive and dispositive judicial construction of a statute or the state Constitution by a California appellate court after the effective date of this Compact, that Gaming Devices may lawfully be operated by another person, organization, or entity (other than an Indian tribe pursuant to a compact) within California.



05/04/2004 07:53 FAX 702407     HARRAH'S ENTERTAINMENT                    041

## Sec. 13.0 NOTICES.

Unless otherwise indicated by this Gaming Compact, all notices required or authorized to be served shall be served by first-class mail at the following addresses:

Governor
State Capitol
Sacramento, California 95814

Tribal Chairperson
Rincon Band of Mission Indians
Post Office Box 68
Valley Center, CA 92082

**Sec. 14.0. CHANGES IN IGRA.** This Gaming Compact is intended to meet the requirements of IGRA as it reads on the effective date of this Gaming Compact, and when reference is made to the Indian Gaming Regulatory Act or to an implementing regulation thereof, the referenced provision is deemed to have been incorporated into this Compact as if set out in full. Subsequent changes to IGRA that diminish the rights of the State or the Tribe may not be applied retroactively to alter the terms of this Gaming Compact, except to the extent that federal law validly mandates that retroactive application without the State's or the Tribe's respective consent

**Sec. 15.0. MISCELLANEOUS.**

**Sec. 15.1. Third Party Beneficiaries.** Except to the extent expressly provided under this Gaming Compact, this Gaming Compact is not intended to, and shall not be construed to, create any right on the part of a third party to bring an action to enforce any of its terms.

**Sec. 15.2. Complete agreement; revocation of prior requests to negotiate.** This Gaming Compact, together with all addenda and approved amendments, sets forth the full and complete agreement of the parties and supersedes any prior agreements or understandings with respect to the subject matter hereof.

**Sec. 15.3. Construction.** Neither the presence in another tribal-state compact of language that is not included in this Compact, nor the absence in this Compact of language that is present in another tribal-state compact shall be a factor in construing the terms of this Compact.

**Sec. 15.4. Most Favored Tribe.** If, after the effective date of this Compact, the State enters into a Compact with any other tribe that contains more favorable provisions with respect to any provisions of this Compact, the State shall, at the Tribe's request, enter into the preferred compact with the Tribe as a superseding substitute for this Compact; provided that the duration of the substitute compact shall not exceed the duration of this Compact.

05/04/2004 07:54 FAX 7024076...  HARRAH'S ENTERTAINMENT ☒042

**Sec. 15.6. Representations.**

By entering into this Compact, the Tribe expressly represents that, as of the date of the Tribe's execution of this Compact: (a) the undersigned has the authority to execute this Compact on behalf of his or her tribe and will provide written proof of such authority and ratification of this Compact by the tribal governing body no later than October 9, 1999; (b) the Tribe is (i) recognized as eligible by the Secretary of the Interior for special programs and services provided by the United States to Indians because of their status as Indians, and (ii) recognized by the Secretary of the Interior as possessing powers of self-government. In entering into this Compact, the State expressly relies upon the foregoing representations by the Tribe, and the State's entry into the Compact is expressly made contingent upon the truth of those representations as of the date of the Tribe's execution of this Compact. Failure to provide written proof of authority to execute this Compact or failure to provide written proof of ratification by the Tribe's governing body will give the State the opportunity to declare this Compact null and void.

**IN WITNESS WHEREOF,** the undersigned sign this Compact on behalf of the State of California and the Rincon Band of Mission Indians.

Done at Sacramento, California, this 10th day of September 1999.

**STATE OF CALIFORNIA**

By Gray Davis
Governor of the State of California

**RINCON BAND OF MISSION INDIANS**

By JOHN D. CURRIER
Chairperson of the Rincon Band of Mission Indians

05/04/2004 07:54 FAX 7024076254    HARRAH'S ENTERTAINMENT    ☑043

ATTEST:

By Bill Jones
Secretary of State, State of California



/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

' / /

' / /

EXHIBIT 3

# PATRON TORT CLAIMS ORDINANCE

### I.    TITLE.

This Ordinance shall be referred to as the "Patron Tort Claims Ordinance."

### II.    PURPOSE.

The purposes of this Ordinance are:

    A.    To set forth the terms and conditions under which the Tribe will grant a limited waiver of its sovereign immunity to suit but only in the forum identified in this Ordinance, and not otherwise, solely on claims for money damages resulting from injuries to Patrons or property at the Tribe's Gaming Facility or in connection with the Tribe's Gaming Operation;

    B.    To establish procedures for the prompt and fair adjudication of any claims against the Tribe subject to this Ordinance, and assuring payment of claims determined to be legitimate; and

    C.    To establish liability insurance requirements for the Tribe's Gaming Operation; and

    D.    To establish a timely and effective administrative procedure by which any Patron who alleges they have suffered damage as a result of an injury to person or personal property caused by a negligent act of an Employee is required to submit an administrative claim to the Administrative Officer on a form approved by the Business Committee for that purpose and to allow the Administrative Officer to consider the merits of the claim and either approve or reject the claim as a precondition to the Claimant filing a lawsuit against the Tribe.

### III.    DEFINITIONS

As used in this Chapter, the following words and phrases shall have the meanings given to them in this section unless the context clearly indicates otherwise.

"**Administrative Officer**" means the Director of Tribal Administration or their designee.

"**Agent**" means any person, whether paid or unpaid, acting on behalf of the Tribe within the scope of their employment and within the scope of their authority.

"**Assumption of the Risk**" means knowingly accepting the risks and dangers associated with any act.

"**Award**" means money damages that are payable to compensate for any injury recognized under this Ordinance.

1819667.3



**"Certified Claim"** is a Patron's Claim that the Administrative Officer has certified as complying with all procedural requirements and stating a prima facie case that a Claimant has sustained a Compensable Injury.

**"Claim"** means a petition by a Patron for an award under this Ordinance. A claim may be filed with respect to any injury as defined in this Ordinance and that is expressly covered by the Class III liability insurance of the Tribe and only to the extent covered by the Class III Gaming insurance policy.

**"Claimant"** is the Patron who submits a Claim to the Administrative Officer.

**"Compact"** is the Tribal-State Class III gaming compact executed by the Governor of California and the Tribe, ratified by the California Legislature and approved by the Secretary of the Interior or an authorized representative thereof.

**"Comparative Negligence"** means negligence is measured in terms of percentage, and any damages allowed shall be diminished in proportion to the amount of negligence attributable to the Patron for whose injury, damage or death recovery is sought.

**"Contributory Negligence"** means the negligence of a Patron which is a contributing cause and which cooperates with the negligence of the defendant in causing the plaintiff's injury.

**"Dangerous Condition"** means a physical aspect of a Gaming Facility or the use thereof that constitutes an unreasonable risk to human health or safety, that is known to exist or that in the exercise of reasonable care should have been known to exist and that condition is proximately caused by the negligent acts or omissions of the Tribe in constructing or maintaining such facility. A dangerous condition should have been known to exist if it is established that the condition had existed for such a period of time and was of such a nature that, in the exercise of reasonable care, such condition and its dangerous character should have been discovered. A dangerous condition shall not exist solely because the design of any facility is inadequate nor due to the mere existence of wind, ice or temperature by itself, or by the mere existence of a natural physical condition, or act of God or anything beyond the control of the Tribal Gaming Operation.

**"Duty"** exists when a person is legally required to conduct himself in a particular manner at the risk that if he does not do so he may be liable to another to whom the duty is owed for injury suffered by such other person.

**"Employee"** means a part or full time employee or an agent of the Tribe's Gaming Operation or Management Contractor, when acting during the course and within the scope of their employment whether with or without compensation. This term includes officers and directors of the Gaming Operation or Management Contractor when they are acting to fulfill their duties to the Tribe's Gaming Operation. This does not include agents or representatives of the United States or of the State of California or any of their political subdivisions or any official of the Tribe acting in any capacity other than fulfilling their duties to the Gaming Operation. Employee shall not include an officer, agent or employee of the Tribe that is not acting in a capacity as an officer, agent or employee of the Tribe's Gaming Operation,

2

**"Fault"** means the failure to fulfill a legal duty. It includes, but is not limited to, acts proximately causing or substantively contributing to injury or damages sustained by a person, and includes negligence in all of its degrees, comparative negligence, contributory negligence, and assumption of risk.

**"Gaming Facility"** means the buildings in which the Tribe's Class III gaming activities or gaming operations occur, or in which the business records, receipts, or other funds of the gaming operation are maintained (excluding offsite facilities primarily dedicated to storage of those records, and financial institutions), and all rooms, building, and areas, including parking lots and walkways, a principal purpose of which is to serve the activities of the Class III gaming provisions of the Tribe's Gaming Operation.

**"Gaming Operation"** or **"Tribal Gaming Operation"** is the business enterprise owned by the Tribe that offers and operates Class III gaming activities on Indian lands over which the Tribe exercises jurisdiction. For the limited purposes of this Ordinance, Tribal Gaming Operation shall include the Management Contractor, provided that the Management Contractor is acting pursuant to an approved management contract and acting on behalf of the business enterprise owned by the Tribe that offers and operates Class III gaming activities on Indian lands over which the Tribe exercises jurisdiction.

**"Gross Negligence"** means conduct which involves negligence plus knowledge of facts which would lead a reasonable person to realize: (1) that the conduct creates an unreasonable risk of physical harm to another or to the actor, and (2) that such risk of physical harm is substantially greater than that which is necessary to make the actor's conduct negligent. Gross negligence of an actor requires a reckless disregard for the safety of the actor or others.

**"Injury"** means injury to a Patron, death, damage to or loss of property of whatever kind, which, if caused by the negligent or wrongful act or omission of a private person would be a tort under Tribal law, applicable federal law, and, to the extent consistent with Tribal law, laws of the State of California in effect as of the date of this Ordinance, regardless of the type or form of action or form of relief sought by the Claimant.

**"Intentional Tort"** means torts where the actor desires to cause the consequences of his act, or where the actor knows or should know that the consequences are substantially certain to result from the act.

**"Intertribal Court"** shall mean the Intertribal Court of Southern California.

**"Licensee"** means a person who comes on to the Premises for his own purposes but with the Tribe's consent.

**"Management Contractor"** means any Person who has entered into a valid and effective management contract with the Tribe, provided that the management contract has been approved by the National Indian Gaming Commission pursuant to the Indian Gaming Regulatory Act and its accompanying regulations.

3



**"Negligence"** means conduct which falls below the standard established by law or custom for the protection of others against unreasonable risk of injury or harm. The standard of conduct to which a person must conform to avoid being negligent is that of a reasonable person under similar circumstances. Negligence includes both acts and omissions.

**"Negligence Per Se"** is an act or omission resulting in damage to another which is strictly declared and treated as negligence, because the act or omission is a violation of a particular statute or ordinance.

**"Non-Member"** means a person who is not an enrolled member of the Tribe.

**"Patron"** shall mean a person present at and who can show that they intend to be a customer of the Tribe's Gaming Facility, but shall not include a Licensee or Trespasser.

**"Person"** means any individual, partnership, corporation, association, government or private organization of any kind other than the Tribe.

**"Plaintiff"** means a person who makes a claim against another in a lawsuit.

**"Premises"** means the property at the Tribe's Gaming Facility which is open to the public.

**"Products Liability"** means the liability of a manufacturer, distributor or seller of a product for damages for bodily injury, death or property damage caused by or resulting from the manufacture, construction, design, formulation, installation, preparation, assembly, testing, packaging, labeling, sale, use or consumption of any product; the failure to warn or protect against a danger or hazard in the use or misuse of the product; or failure to provide proper instructions for the use or consumption of any product.

**"Property"** shall mean personal property. All references herein to property shall refer solely to personal property.

**"Punitive Damages"** are damages in a tort action having the character of a punishment or a penalty; damages inflicting a punishment or penalty.

**"Rejected Claim"** is a Claim that the Tribe cannot certify because Claimant has failed to comply with one or more procedural requirements as provided herein, including deadlines for filing claims and proper notice of compensable injuries.

**"Trespasser"** means a person who enters or remains upon the land of another without permission or the right to do so.

**"Tribal Business Committee"** or **"Business Committee"** shall mean the governing body of the Tribe, as established by the Tribe's constitution. Within the confines of this Ordinance, reference to the Business Committee requiring an action shall mean the Business Committee or its designee.

"**Tribal law**" means the Constitution of the Tribe, laws, rules, regulations, ordinances and other legislative enactments adopted by the Tribe, tribal custom and tradition, and common law of the Tribe.

"**Tribe**" means the Rincon San Luiseno Band of Mission Indians, including but not limited to any branch, office, department, agency, commission, utility, authority, instrumentality, enterprise, corporation (whether chartered under Tribal or federal law, but excluding for purposes of this Ordinance corporations chartered under the law of any State), or other entity of the Tribe. Within the confines of this Ordinance, reference to the Tribe requiring an action shall mean the Tribe or its designee.

## IV.    CLAIMS COVERED BY THIS ORDINANCE.

A.      Applicability. This ordinance shall apply to those injuries resulting from negligent injuries to Patrons or property located at the Gaming Facility.

B.      This ordinance only applies to those claims covered by a limited waiver of sovereign immunity found at Section V herein. This Ordinance creates both procedures and remedies relating to redress of injuries to persons or property proximately caused by the negligent acts or omission(s) exclusively by an Employee on the premises of the Tribe's Gaming Facility.

C.      The Tribal Gaming Operation may be determined to be liable for injury caused by a Dangerous Condition of its property only if the Claimant establishes that the Gaming Facility was in a Dangerous Condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the Dangerous Condition created a reasonably foreseeable risk of the kind of injury that was incurred, and that either:

(1)      a negligent or wrongful act or omission, or an Employee acting within the scope of his or her office, employment, or agency, created the dangerous condition; or

(2)      the Tribal Gaming Operation had actual knowledge or constructive notice of the Dangerous Condition and sufficient time prior to the injury to have taken measures to remedy or protect against the dangerous condition.

D.      In Claims for wrongful death of a Patron, the Tribe may be found liable for actual or compensatory damages, measured by the pecuniary injuries resulting from such death to the persons for whose benefit the Claim is brought. Claims for non-pecuniary personal injury not involving death must be personal to the Claimant. Claims for injury to or loss of property shall be limited to the fair market value of the property immediately preceding the moment of loss or injury.

E.      Claimants may recover damages only to the extent that such damages are covered by and payable from the Tribe's Class III Gaming insurance policy required under the terms of the Tribe's Compact.

5

F.    Claimants may not recover punitive or exemplary damages.

## V.    LIMITED WAIVER OF SOVEREIGN IMMUNITY

A.    The Tribe hereby provides a limited waiver of sovereign immunity for the purposes of applying and enforcement of this Ordinance. This waiver of sovereign immunity shall be read narrowly and shall not allow for any remedy other than monetary damages which may only be derived from the Tribe's Class III Gaming insurance policy proceeds. In the event that the Class III Gaming insurance policy required by the Compact is ineffective and insurance proceeds are non-existent or insufficient, no further remedy is available. The Tribe hereby provides a limited grant of jurisdiction of matters arising solely out of and pursuant to this Ordinance to the Intertribal Court. This grant of jurisdiction to the Intertribal Court shall be narrowly construed and shall not give rise to any pendant jurisdiction for any related claims. The Tribe has not waived the sovereign immunity of the Tribe from suit in state or federal court, or for any claims not specifically described herein. The limited waiver of sovereign immunity provides as follows:

(1)    An action for monetary damages may be brought in Intertribal Court under this Ordinance against the Tribal Gaming Operation only by a Patron for any injury to that Patron caused (a) by an act or omission by the Tribal Gaming Operation within the Gaming Facility, or (b) by an act or omission by any Employee acting on behalf of the Tribal Gaming Operation and within the scope of employment and scope of authority of that Employee.

(2)    An action may be brought in Intertribal Court under this Ordinance against the Tribal Gaming Operation solely for monetary damages. No other judgment, order or award of declaratory, injunctive or other relief shall be entered under this Ordinance against the Tribal Gaming Operation or Tribe. The Intertribal Court shall give due weight to the sovereign, governmental and public interests of the Tribe and Tribal Gaming Operation in determining whether to grant any relief against the Tribal Gaming Operation.

(3)    The sovereign immunity of the Tribal Gaming Operation is waived only to the extent of the minimum monetary policy limits of the Tribe's Class III Gaming liability insurance as required by the Compact, and such Claims may only be paid out of the Tribe's Class III Gaming liability insurance, and only in the following instances:

(a)    When the injuries alleged are proven to have been proximately caused by the wrongful or negligent acts of the Tribal Gaming Operation or Employees arising out of the performance of their duties during the course and within the scope of their employment at the tribal Gaming Facility and the Gaming Operation that are covered within the Tribe's Class III Gaming insurance policy;

(b)    When the injuries alleged are proven by clear and convincing evidence to have been proximately caused by the Dangerous Condition of any property of the Tribe's Class III Gaming Facility that are covered within the

6

Tribe's Class III Gaming insurance policy, provided the Claimant establishes that the property was in a dangerous condition.

(4)    No judgment, order or award pertaining to any Claim for monetary damages permitted by the Ordinance shall be for more than the limits of valid and collectible Class III Gaming insurance policy carried by the Tribe covering each such Claim and in force at the time of such judgment, order or award.

(5)    Any such judgment, order or award of monetary damages may only be satisfied pursuant to the express terms of the Class III Gaming insurance policy which is in effect at the time of such judgment, order or award.

(6)    The procedures and standards for giving notice of Claims and commencing actions in Intertribal Court provided in Section VII of this Ordinance are integral parts of the limited waiver of sovereign immunity provided by this Ordinance and shall be strictly and narrowly construed. A tort Claim for monetary damages against the Tribal Gaming Operation shall be forever barred unless such procedures and standards are strictly complied with and written notice of the Claim is presented to the Administrative Officer and an action for monetary damages relating to any such Claim is commenced in Intertribal Court in complete compliance with Section VII of this Ordinance.

(7)    The sovereign immunity of the Tribe shall continue except to the extent that it is expressly waived by this Ordinance. Members of the Business Committee shall remain immune from suit for actions taken during the course and within the scope of their duties as members of the Business Committee.

## VI.    CLAIMS EXCLUDED

A.    The Tribe's waiver of sovereign immunity pursuant to this Ordinance is limited only to those Claims and remedies provided for in Section V. The following list is meant to be illustrative, and not an exhaustive list of Claims that may not be brought pursuant to this Ordinance. Notwithstanding any other provision of this Ordinance, there shall be no exception to or waiver of sovereign immunity for any claim of monetary damages for any injury alleged to have resulted from or related to:

(1)    Any injury allegedly sustained by a Tribal official, agent or employee in connection with their employment or performance of official duties;

(2)    Any injury proximately caused by a negligent or intentional act that was committed outside the course and scope of the employment and/or authority of a Tribal official, employee or agent whose negligence or intentional misconduct are alleged to have caused the injury;

(3)    Any injury proximately caused by the act or omission of any person who is not an officer, employee or agent of the Tribe;

7

(4)     Any injury proximately caused by an independent contractor of the Tribe;

(5)     An injury proximately caused by any acts or omissions committed by any patron of a Tribal Gaming Facility;

(6)     Exercise or performance or the failure to exercise or perform a discretionary function or duty or the implementation or failure to implement decisions by the Tribe or any agent, employee or officer of the Tribe whether or not the discretion be abused in any such matter;

(7)     Any Claim based upon an act or omission of any agent, employee or officer of the Tribe exercising due care, in the execution of any Tribal, federal, or state statute, rule or regulation, whether or not such statute, rule or regulation be valid;

(8)     Any intentional tort, including but not limited to assault, battery, false imprisonment, malicious prosecution, abuse of process, libel, slander, defamation, misrepresentation, deceit, interference with contract rights, or interference with prospective economic advantage;

(9)     Tribal legislative or judicial action or inaction, or administrative action or inaction of a legislative or judicial nature, such as but not limited to adopting or failing to adopt a law;

(10)     Issuance, denial, suspension or revocation of, or the failure or refusal to issue, deny, suspend or revoke, any permit, license, certificate, approval or other authorization provided for under Tribal law;

(11)     Alleged damages or injuries arising from actual or prospective contractual relationships between the Tribe and other parties;

(12)     Claims against the Tribe for equitable indemnity or contribution arising from third party litigation;

(13)     Claims against the Tribe for punitive or exemplary damages;

(14)     Claims against the Tribe based on any theory of Products Liability;

(15)     Claims against the Tribe for an injury to the driver of a motor vehicle who is found by a court of competent jurisdiction to be driving while intoxicated or was driving recklessly;

(16)     Claims against the Tribe for acts of Employees who a court of competent jurisdiction determines to be guilty of a criminal offense;

(17)     Claims against the Tribe for vicarious liability for injuries or damages resulting from any act of an Employee whose acts are outside or beyond the course and scope of the Employee's authority or employment.

8

B.    This Ordinance does not provide, nor is intended to provide, any remedy or forum for Claims for damages in excess of the express terms of the Tribe's Class III Gaming insurance policy which is in effect at the time of such judgment, order or award, or to the extent that such damages are not covered by and out of the Class III Gaming insurance policy.

## VII.    PROCESS FOR FILING A CLAIM

A.    Contents of the Claim. No action may be brought in Intertribal Court for monetary damages under this Ordinance and no Claim shall be valid for monetary damages under this Ordinance unless the Patron who claims to have suffered an injury shall send a written notice of the Claim for monetary damages as provided herein. A Claimant, who must be a Patron, or his or her representative must file a written Claim with the Administrative Officer presenting all material facts relating to the alleged incident and injury. The Claim must be completed on the form provided by Administrative Officer. Upon request to the Administrative Officer, a Claim form will be provided. At a minimum, the written Claim must contain the following:

(1)    the name, mailing address, and telephone number of the Claimant and the name and current address and telephone number of the Claimant's attorney, if any;

(2)    the purpose that the Claimant was present at the Gaming Facility;

(3)    a concise statement describing the conduct, circumstances or other facts which brought about the injury; describing the injury; stating the time and place of injury;

(4)    the name, addresses and telephone numbers, or description of all persons, if known, involved in the incident or occurrence that gave rise to the Claim;

(5)    the name, addresses and telephone numbers, if known, or description of all known witnesses, to the incident or occurrence that gave rise to the Claim; and

(6)    the alleged damage or injury suffered, the amount claimed, identified as a sum certain, as of the date of presentation of the claim, including the estimated amount of any prospective injury, damage, or loss, insofar as it may be known at the time of the presentation of the claim, together with the basis of computation of the amount claimed.

In the event that the Claimant does not possess complete information about the Claim when the Claim is presented, the Claim shall identify the information that Claimant lacks, set forth the reason(s) why the information cannot be presented with the initial submission of the Claim and request that the Claimant's time to complete submission of the Claim be extended by the amount of time, not to exceed ninety (90) calendar days from the date of the alleged incident or occurrence upon which the Claim is based, that Claimant anticipates will be required to obtain and submit the additional information.

B.    Penalty of Perjury. The Claim must be signed by the Claimant under penalty of perjury. If the Claimant is unable to sign the Claim because of physical or mental incapacity, or because the Claimant is deceased, the Claim must be signed under penalty of perjury by an immediate family member, or guardian appointed by a court of competent jurisdiction, with

9

personal knowledge of the contents of the Claim. The Claim shall be dismissed and forever barred upon a finding of perjury by the Intertribal Court.

C.    Filing Procedures and Time Limits. Claimant must file his/her Claim with the Administrative Officer, either by personal delivery, certified U.S. mail, return receipt requested, or overnight courier with proof of delivery requested. The Administrative Officer shall be located at 33750 Valley Center Road, Valley Center, California, 92082. To be timely submitted, the Claim must be received by the Administrative Officer no later than ninety (90) calendar days after the date of the alleged incident or occurrence, unless this period is extended by written agreement of the Business Committee before the expiration of that initial period or the Claimant was physically or mentally incapable of submitting the Claim within that period. If the 90th day falls on a Saturday, Sunday, or officially-recognized federal, or Tribal holiday, the 90th day shall be deemed to be the next business day. This time limit is jurisdictional and shall be strictly construed to preclude late-filed Claims. If the Claim was not timely filed due to the physical or mental incapacity of the Claimant, the Claim must be accompanied by a declaration under penalty of perjury by the Claimant's treating physician attesting to the date upon which Claimant became incapacitated and the date upon which Claimant regained capacity, or an order of a court of competent jurisdiction to the same effect. The time for filing a Claim will be tolled during the period of incapacity so established, provided that the maximum period for tolling shall not exceed one hundred eighty (180) days. Otherwise, the Tribe may relieve a Claimant of untimeliness, at the Tribe's sole discretion, only if such untimeliness was a result of excusable neglect.

D.    Amending and Supplementing Claims. A Claimant may amend or supplement the Claim at any time within ninety (90) calendar days of the alleged incident or occurrence upon which the Claim is based, but only if the amendment relates to the same transaction or occurrence that gave rise to the original Claim. Thereafter, the Claimant may amend the Claim only with the consent of the Business Committee or its designated representative.

E.    Notice of Rejection of Claim. If a Claim as presented fails to comply substantially with the requirements of this Ordinance or the requirements of a form provided under this Ordinance, the Administrative Officer shall, within sixty (60) days after the Claim is received by the Administrative officer, give written notice of its rejection, pursuant to Section IX(B) of this Ordinance, stating with particularity the defects or omissions therein.

F.    Certification of Claim. If the Claim as presented complies substantially with the requirements of this Ordinance or the requirements of a form provided under this Ordinance, the Administrative Officer shall notify Claimant of such at any time within sixty (60) days after the Claim is received by the Administrative Officer. For purposes of this Ordinance, all notices shall be deemed received on the date such notice is post marked or otherwise dated, provided that such notice is sent certified U.S. mail, return receipt requested, or overnight courier with proof of delivery requested. Should the Administrative Officer fail to notify the Claimant that a Claim is certified or not certified within sixty (60) days after the Claim is received by the Administrative Officer, then such Claim shall be deemed rejected pursuant to VII(F). Additionally, Claimant must also comply with Section IX of this Ordinance.

10

G.    <u>Commencement of Claim in Intertribal Court</u>. To commence a Claim in Intertribal Court pursuant to the Ordinance and the limited waiver of sovereign immunity contained herein, the Claimant must provide a notice of certification of the Claim to the Intertribal Court within thirty (30) days of receipt of Claim certification, or within thirty (30) days of deemed Claim rejection pursuant to Section VII(F), and must also comply with the Code of Civil Procedure and Rules of Court of the Intertribal Court of Southern California. Failure to provide such notice of certification to the Intertribal Court within such time shall bar Claimant's Claim(s). Upon receipt of such certification, and confirmation of the same with the Administrative Officer, the Intertribal Court shall set a settlement conference between the Claimant and the Business Committee, within ninety (90) days of receipt of the Certified Claim.

H.    <u>Intertribal Court Adjudication</u>. After a Claim is commenced in Intertribal Court and a settlement conference has been completed, the parties and the Claim shall proceed pursuant to the Code of Civil Procedure and Rules of Court of the Intertribal Court of Southern California, to the extent that such Code and Rules do not conflict with this Ordinance and the laws of the Tribe. The Intertribal Court shall have the authority to adjudicate only those actions provided for within this Ordinance.

I.    In any action against the Tribe under this Ordinance for monetary damages the Tribe shall have not less than sixty (60) days after receipt of the complaint and summons as provided in the Code of Civil Procedure and Rules of Court of the Intertribal Court of Southern California, and such other time as the Intertribal Court may allow, to file an answer or other responsive pleading or motion.

J.    <u>Default Judgment</u>. No default judgment may be entered against the Tribe under this Ordinance.

K.    <u>Acceptance of Insurance Proceeds</u>. If at any time, Claimant accepts payment from the Insurance Carrier, its Claim shall be deemed moot and no further relief shall be available,

## VIII.  DISPOSITION BY ADMINISTRATIVE OFFICER AS PREREQUISITE

A.    Immediately upon a Claimant filing notice of a Claim with the Administrative Officer, the Administrative Officer shall provide the Tribal Business Committee, the tribal attorney, as well as the Tribe's Class III Gaming insurance carrier a copy of the Claim. The Administrative Officer shall make an investigation into the alleged charges. Should the Administrative Officer have a relationship with the Claimant that is or could be viewed as a conflict of interest, that Administrative Officer shall recuse himself from participating in the investigation. Upon completion of the investigation, the Administrative Officer shall file a written report to the Business Committee with their assessment of the validity of the Claim as well as a recommendation to the Business Committee as to disposition of the Claim. Nothing herein shall preclude the Business Committee from intervening in this process and having the matter taken up directly by the Business Committee.

11

B.    Upon a Claimant filing notice with the Administrative Officer and the Administrative Officer's submission of its investigative report to the Business Committee, the Business Committee may consider, ascertain, adjust, determine, compromise, and settle any Claim for money damages against the Tribal Gaming Operation.

C.    In the event that the Business Committee has given approval of a Claim, and chooses to have the Claim paid by the Class III Gaming insurance policy carrier, such approval of the Claim shall not be final unless and until the Tribe's Class III insurance policy carrier approves payment of the award. The Tribe's Class III insurance policy carrier decision to decline the payment of the award shall be deemed to be the final decision of the Business Committee.

D.    Subject to the provisions of this title relating to civil actions on tort claims against the Tribe, any such award, compromise, settlement, or determination shall be final and conclusive on all officers of the Tribal government.

E.    The acceptance by the Claimant of any such award, compromise, or settlement shall be final and conclusive on the Claimant, and shall not be granted unless such acceptance constitutes a complete release of any claim against the Tribe, the Tribal Gaming Operation, the Management Contractor and against any Employees whose acts or omission gave rise to the Claim, by reason of the same subject matter. Such a release shall be obtained from the Claimant prior to the payment of the Claim.

F.    An action shall not be instituted upon a Claim against the Tribal Gaming Operation for money damages for injury or loss of property or personal injury or death caused by a Dangerous Condition on the Gaming Facility, or by the negligent or wrongful act of any Employee while acting within the scope of his office or employment, unless the Claimant shall have first presented the Claim to the Administrative Officer and his Claim shall have been certified and subsequently denied by the Tribe, in writing, and sent by certified or registered mail to the Claimant. The failure of the Tribe to make final disposition of a Claim within sixty (60) days after it is filed with the Administrative Officer shall be deemed a rejection of the Claim.

G.    Actions under this section shall not be instituted for any sum in excess of the amount of the Claim presented to the Administrative Officer, except where the increased amount is based upon newly discovered evidence not reasonably ascertainable at the time of presenting the Claim to the Administrative Officer or Tribal Business Committee, or upon allegation and proof of intervening facts, relating to the amount of the Claim.

H.    Disposition of any Claim by the Tribe shall not be an admission of liability or amount of damages and shall not be used against the Tribe in any Tribal, federal, or state court or administrative proceeding.

## IX.    CERTIFICATION OR REJECTION OF CLAIMS BY THE ADMINISTRATIVE OFFICER.

A.    Within sixty (60) calendar days of the receipt of a Claim by the Administrative Officer, the Administrative Officer or its designated representative shall determine whether:

12

(1)    the Claim was received within ninety (90) calendar days of the alleged incident or occurrence;

(2)    the Claim as presented substantially complies with the above-described content requirements and is signed under penalty of perjury;

(3)    the Claim alleges that the Claim resulted from negligent injuries to a Patron or property at the Gaming Facility or in connection with the Tribe's Gaming Operation.

(4)    the Claim alleges that the injury or damage was the proximate result of a negligent or wrongful act or omission of any Employee, or that such act or omission may have been a contributing cause of the alleged injury or damage; and

(5)    seeks a remedy created by and available under this Ordinance.

These determinations shall be made solely for the purpose of certifying the Claim for further proceedings, and shall not constitute a determination of the merits of the Claim.

B.    If the Claim does not meet one or more of the above-listed requirements, subject-matter jurisdiction has not been established and the Claim shall not be certified. In such a case, the Tribe or its designated representative shall send to the Claimant a written "Rejection of Claim" stating all grounds for the Tribe's failure to certify the Claim. Unless the rejection was based on a failure to file the Claim within ninety (90) days of the alleged injury, the Claimant will be permitted an additional ten (10) calendar days (from the date of mailing of the Rejection of Claim) to amend the Claim so as to comply with the above-listed prerequisites for certification. If the Claimant files an amended Claim, which still does not satisfy the above-listed requirements, the Administrative Officer, within thirty (30) calendar days of receipt of the amended Claim, will issue a final Rejection of Claim, or, at the Business Committee's discretion, may certify the Claim.

C.    Appeal of Non-Certification of a Claim.  The Claimant may appeal the notice of non-certification of Claim" by submitting in writing the intention to Appeal the "Notice of non-certification within thirty (30) calendar days from the letter of non-certification of the Claim. Such appeal shall be made to the Intertribal Court.  In such an appeal, the Intertribal Court's review shall be limited solely to whether the Claimant has complied with Section IX(A)(1-5) of this Ordinance.  The relief granted by the Intertribal court is limited to certification of the Claim or a finding that the Claim is not certified and that subject matter jurisdiction does not lie in the Intertribal Court.

## X.    RECOGNIZED TRIBAL DEFENSES

A.    With respect to any Claim to which this Ordinance applies, the Tribe shall be entitled to assert any defense based upon judicial or legislative immunity which otherwise would have been available to the employee or agent of the Tribe whose act or omission gave rise to the Claim, as well as any other defenses to which the Tribe is entitled.

13

B.    This Ordinance does not provide any remedy for alleged injuries resulting from policy decisions or the exercise of discretion vested in the Tribe or an Employee, or any act or omission of an officer, employee, or agent that was the result of the good faith execution or enforcement of any Tribal, federal, or California ordinance, resolution, law, or rule.

C.    This Ordinance does not provide any remedy for alleged damages or injuries arising from a misrepresentation, or good faith mistake or error, by an officer, employee, or agent of the Tribe unless such misrepresentation was a result of actual fraud, corruption, or malice, and the Claimant reasonably relied upon such misrepresentation to his/her detriment.

D.    Any liability for monetary damages assumed by the Tribe for the acts or omissions of Employee under this Ordinance shall be the exclusive remedy available to any person who suffers an injury caused by the Employee. Any Claim for monetary damages assumed by the Tribe which otherwise would lie against an Employee or the Tribe except for this Ordinance is forever extinguished in favor of the remedy established and limited by this Ordinance, whether or not the person in whose favor such remedy is created exercises the right to timely present written notice of any Claim and commence an action for an injury in Intertribal Court under this Ordinance.

E.    The Tribal Gaming Operation shall not be liable for injury or damage caused by a condition of its property if it is established that the act or omission that created the condition was reasonable, based on weighing the probability and gravity of the potential injury against the practicability and cost of taking alternative action to prevent or protect against the risk of injury, or if the Claimant knew or reasonably should have been aware of the condition prior to sustaining the injury upon which the Claim is based.

F.    This Ordinance does not provide any remedy for any person who is not a Patron of the Gaming Facility.

## XI.    REMEDY LIMITATIONS

A.    Negligence Per Se; Violation Of Ordinance.

A Patron who violates any Tribal ordinance, regulation or other federal or state law governing the conduct of a person is negligent per se whether or not such person has actual knowledge of such ordinance or law. A Patron's ignorance of such Tribal ordinance or law shall not be a defense.

B.    Comparative Negligence

(1)    Contributory negligence shall not bar a recovery in any tort action by any Patron or his legal representative to recover damages for negligence resulting in injury or harm to a Patron or property, provided that the contributory negligence of said Patron is not more than fifty percent (50%) of the total fault. Any damages allowed shall be diminished in proportion to the amount of negligence attributed to the Patron recovering.

14

(2)    Assumption of the risk shall not bar a recovery in any tort action by any Patron or his legal representative to recover damages for negligence resulting in injury or harm to a Patron or property, provided that the assumption of the risk of said Patron is not more than fifty percent (50%) of the total fault. Any damages allowed shall be diminished in proportion to the amount of negligence attributed to the Patron recovering.

(3)    In the event that a Claimant acts intentionally or is grossly negligent, that Claimant shall be presumed to be one hundred percent (100%) at fault for the injury or harm and shall not recover, except as provided herein.

(4)    The court shall make special findings of fact, determining the total amount of damages and the percentages of fault attributable to each actor whether or not a party. In the event the court finds that a plaintiff's contributory negligence or assumption of the risk is more than fifty percent (50%) of the total fault then that Patron shall not recover and its finding must be for the defense.

(5)    Pro Rata Shares. In determining the pro rata share of each party in the entire liability, the relative degrees of fault of each party shall be the basis for allocations, and, if equity requires, the collective liability of some as a group may constitute a single share.

C.    Joint And Several Liability Abolished. In any action for personal injury, property damage or wrongful death, the liability of each defendant for damages is several only and is not joint, except as provided herein. Each defendant is liable only for the amount of damages allocated to that defendant in direct proportion to that defendant's percentage of fault. Separate judgment shall be entered in a judgment against the defendant for that amount.

## XII.    FINALITY

A.    Except as otherwise expressly provided herein, any Award, compromise, settlement, or determination of a Claim under this Ordinance must be in writing and approved by the Business Committee.

B.    Any Award, compromise, settlement, or determination of a Claim under this Ordinance shall be final and conclusive on the Tribe, except when procured by means of fraud. The determination of the Court shall be final and conclusive upon both the Claimant and the Tribe, provided that such Award, compromise, settlement, or determination does not conflict with this Ordinance or the laws, rules and regulations of the Tribe.

C.    The acceptance by a Claimant of any Award, compromise, settlement, or determination of a Claim shall be final and conclusive on the Claimant. Said acceptance shall constitute a complete release of any present or future claim arising from the same or connected circumstances by the Claimant against the Tribe and its employees and agents whose act or omission gave rise to the Claim, whether or not such future claims or the circumstances warranting such future claim are known or unknown to the Claimant at the time the Claimant accepts the settlement.

15

## XIII.  ENFORCEMENT

A.      <u>Enforcement of an Award</u>. A party may seek to confirm and enforce an award under this Ordinance by petitioning the Intertribal Court for such confirmation and enforcement. The Tribe's insurer shall pay any cognizable award in the same manner and at the same time as judgments rendered in the courts of the United States, provided however that the Tribe shall not be obligated to pay any award that is not covered by, or exceeds, the policy limits of the Tribe's Class III Gaming insurance policy.

B.      <u>Interest</u>. The Tribe shall not be liable for interest prior to the rendition of an Award.

## XIV.  APPLICABLE LAW

Tribal law and applicable federal law shall apply and shall govern all Claims and actions brought under this Ordinance.

## XV.   INCONSISTENT LAWS REPEALED

All Tribal Ordinances or other laws inconsistent with this Ordinance are hereby repealed and superseded by this Ordinance.  All Claims arising prior to the effective date of this Ordinance may be adjudicated pursuant to this Ordinance provided that such Claims may only be resolved pursuant to terms of this Ordinance.

## XVI.  EFFECTIVE DATE

This Ordinance shall be effective upon approval of the Rincon Band Tribal Business Committee.

## PATRON TORT CLAIM FORM

The following information must be completed by the Claimant as required by the Ordinance. Failure of a Claimant to complete this Patron Tort Claim Form will result in the rejection of a Claim. If necessary, this document may be photocopied and additional sheets of paper may be attached to provide the information required below.

1. The name, mailing address, and telephone number of the Claimant and the name and current address and telephone number of the Claimant's attorney.

Name of Claimant:_____

Address:_____

Telephone Number:_____


Name of Claimant's Attorney:_____

Attorney's Address:_____

Attorney's Telephone Number:_____

2. Detailed statement describing the conduct, circumstances or other facts which brought about the injury.

1819667.3

3.    Purpose Claimant was present at the Gaming Facility.

4.    Description of injury.

5.    Date, time and place of injury.

6.    Name, addresses and telephone numbers, or description of all persons, if known, involved in the incident or occurrence that gave rise to the Claim.

Name of Involved Person(s) involved in Incident:_____
Address:_____
Telephone Number:_____

Name of Involved Person(s) involved in Incident:_____
Address:_____
Telephone Number:_____

7.    Name, addresses and telephone numbers, if known, or description of all known witnesses, to the incident or occurrence that gave rise to the Claim;

Name of Witness(es) to Incident:_____
Address:_____
Telephone Number:_____

Name of Witness(es) to Incident:_____
Address:_____
Telephone Number:_____

8.  Alleged damage or injury suffered, the amount claimed, identified as a sum certain, as of the date of presentation of the claim, including the estimated amount of any prospective injury, damage, or loss, insofar as it may be known at the time of the presentation of the claim, together with the basis of computation of the amount claimed.

    a.  Damage or Injury Suffered.

    b.  Amount of Claim. _____ Dollars and 00/100.

    c.  Method of Calculation of amount of Claim.

8.    Penalty of Perjury Statement:

I declare under penalty of perjury, pursuant to applicable law, that all statements contained in
this Patron Tort Claim Form and any accompanying documents is true and correct, with full
knowledge that all statements made in this application are subject to investigation and that any
false or dishonest answer to any question shall be grounds for rejection of a Claim filed pursuant
to the Patron Tort Claims Act, and that any such Claim shall be barred forever.


Signature:    _____

Printed Name: _____

Date:    _____